**RUMELY v. UNITED STATES.**

No. 11066.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 5, 1951.

Decided April 29, 1952.

Bazelon, C. J., dissented.

---

168

Donald R. Richberg, Washington, D. C., with whom Alfons Landa and Delmar W. Holloman, Washington, D. C., were on the brief, for appellant.

William Hitz, Asst. U. S. Atty., Washington, D. C., with whom Charles M. Irelan, U. S. Atty., Washington, D. C., at the time the brief was filed, was on the brief, for appellee.

George Morris Fay, U. S. Atty. at the time the record was filed, and Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., also entered appearances for appellee.

Before PRETTYMAN, PROCTOR and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is an appeal from a judgment of conviction upon three counts of an indict-ment. The three counts read, in pertinent part, as follows:

### Count One

"Defendant Edward A. Rumely, by subpoena served upon him on May 26, 1950, was summoned as a witness by the authority of the House of Representatives of the Congress of the United States, through its Select Committee on Lobbying Activities, to produce before the said Committee records upon the matter under inquiry before the said Committee, that is, to produce the records of the Committee for Constitutional Government, Inc., showing (1) the name and address of each person from whom a total of $1,000 or more has been received by the Committee during the period, January 1, 1947, to May 1, 1950, for any purpose, including, but not limited to (a) receipts from the sale of books, pamphlets, and other literature, (b) contributions, (c) loans; (2) as to each such person the amount, date, and purpose of each payment which formed a part of the total of $1,000 or more. Defendant Rumely appeared before the said Committee on June 6, 1950, in the District of Columbia, but failed and refused to produce the said records, and thereby wilfully did make default."

### Count Six

"Defendant Edward A. Rumely, by subpoena served upon him on August 21, 1950, was summoned as a witness by the authority of the House of Representatives of the Congress of the United States, through its Select Committee on Lobbying Activities, to produce before the said Committee records upon the matter under inquiry before the said Committee, that is, to produce the records of the Committee for Constitutional Government, Inc., showing (a) the name and address of each person from whom a total of $500 or more has been received by the said Committee during the period from January 1, 1947, to August 1, 1950, for any purpose, and (b) as to each such person, the amount, date and purpose of each

payment which formed a part of the total of $500 or more, and all correspondence relating to each such payment. Defendant Rumely appeared before the said Committee on August 25, 1950, in the District of Columbia, but failed and refused to produce the said records, and thereby wilfully did make default."

### Count Seven

"Defendant Edward A. Rumely appeared as a witness before the said Committee at the place and on the date above stated and refused to answer a question put to him by the Committee, namely, who was the woman from Toledo who gave him $2000 for distribution of 'The Road Ahead,' which question was a question pertinent to the question under inquiry."

The offenses thus charged were alleged to be violations of the statute which reads as follows:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."[1]

The Select Committee on Lobbying Activities, generally known as the Select Committee or the Buchanan Committee, was created on August 12, 1949, by the House of Representatives of the United States by a Resolution[2] which, in pertinent part, reads as follows:

"The committee is authorized and directed to conduct a study and investigation of (1) all lobbying activities intended to influence, encourage, promote, or retard legislation; and (2) all activities of agencies of the Federal Government intended to influence, encourage, promote, or retard legislation."

Appellant is the Executive Secretary of an organization known as the Committee for Constitutional Government, Inc., incorporated in 1941 as a successor to an unincorporated Committee formed in 1937. Under instructions of the Committee's trustees he filed in 1946 with the Clerk of the House of Representatives a report, pursuant to the Regulation of Lobbying Act,[3] accompanied by a letter, and thereafter until early 1951 he filed similar reports and letters. One of these letters, in language like that of the others, read in part:

"I am not employed to support or oppose any legislation whatsoever. For this reason and the reasons set forth in my letters to you under previous dates, I protest that I am not under any legal obligation to file reports under said Act, and again request ruling on this question for future guidance."

The Committee for Constitutional Government, Inc., publishes and distributes books and pamphlets, usually pertaining to national affairs and issues. The Report of the Buchanan Committee to the House[4] indicates that the concern distributed, among other things, some 750,000 copies of "The Road Ahead", a book by John T. Flynn, 250,000 copies of "Labor Monopolies and Freedom", a book by John W. Scoville, 130,000 copies of "Compulsory Medical Care and the Welfare State" by Melchior Palyi, about 600,000 copies of the "Constitution of the United States" by Thomas

1. 52 Stat. 942 (1938), 2 U.S.C.A. § 192.
2. H.R.Res. 298, 81st. Cong., 1st Sess.
3. 60 Stat. 839 (1946), 2 U.S.C.A. §§ 261–270.
4. H.R.Rep.No.3024, 81st Cong., 2d Sess. (1950). The transcript of the hearings before the Buchanan Committee is not in this record, except in so far as excerpts were included in the Report to the House (Gov't Ex. 4) or read to the jury. H.R. Rep.No.3239, another report of the Buchanan Committee, is not in this record.

James Norton, thousands of "Why the Taft-Hartley Law" by Irving G. McCann, and millions of engrossed copies of the Bill of Rights to schools and colleges. Rumely testified before the Committee that about 85 per cent of the books were sold in lots of from one to twenty copies and the remainder in bulk sales. Bulk sales took three forms: (1) The purchaser bought the books and distributed them; (2) the purchaser furnished a list of people to whom he wished the books sent, and Rumely's office made the distribution; (3) the purchaser designated in general terms the distributees, such, for example, as 15,000 libraries or 15,000 editors, and Rumely's office made the distribution to a list of names in that category in its files.

Rumely testified, according to the Report of the Committee, that he and his associates do not come down to Congress, that "Our lobbying consists of going out with a viewpoint to the country, and informing people and letting the people talk to their Members of the Congress." Upon occasion copies of a book or pamphlet are distributed to all members of Congress. For example, Rumely said that a purchaser of "Labor Monopolies or Freedom" directed distribution to "every newspaperman" in the United States and also to all Congressmen. The record before us contains no contradiction of that testimony or any different description of the activities of the organization.

In the course of its investigations the Buchanan Committee served upon appellant two subpoenas, one on May 26, 1950, and the other on August 21, 1950. The nature and extent of the subpoenas are indicated in the first and sixth counts of the indictment, quoted in pertinent part above. Sometime in May investigators for the Buchanan Committee appeared at Rumely's office and submitted to him a list of material, in twenty-six items, concerning which the Buchanan Committee desired information. The twenty-sixth item called for the names of all purchasers of books or pamphlets. After some discussion Rumely gave the investigators access to all records, etc., for all purposes except the twenty-sixth item. Pursuant to the first subpoena Rumely appeared before the Commit-

tee on June 6, 27, 28 and 29, 1950. On June 28th Rumely told the Committee, "I am perfectly willing to give everything except one thing. I haven't withheld anything, except the names of the buyers of our books. Those, you can't have." He repeated many times in the course of those hearings that he declined to give any names of people who bought books from his company. On June 29th he told the Committee:

"I certainly refuse to disclose those names—not contemptuously, but respectfully, because I feel it is my duty to uphold the fundamental principles of the Bill of Rights. I think that there is no power to require of a publisher the names of the people who buy his products, and that you are exceeding your right."

The August 21st subpoena, reflected in Count Six of the indictment, called for more material than did the May 26th one, and it required Rumely to appear on August 25th. He appeared and stated that he had brought the material "As far as it was physically possible." He insisted that full compliance was "an impossible thing." He stated, for example, that the investigator had asked for each of the returned checks drawn on the National City Bank in 37 months, that he had put four men to work on that item, and that in 43½ hours they had been able to assemble the checks for only one month. On this appearance Rumely repeated his refusal to give the names of the purchasers of books.

Concerning the transaction which was the basis for Count Seven of the indictment, Rumely testified both before the Buchanan Committee and upon the trial that his Committee had outstanding a general offer to sell copies of the book "The Road Ahead" in bulk at fifty cents a copy. A "woman from Toledo" sent a check for $2,000 and requested that 4,000 copies of the book be distributed to school teachers and clergymen in Toledo, as shown on a list which she furnished. Rumely refused to tell the Buchanan Committee the name of this woman.

In its Report to the House the Buchanan Committee said:

"Our study of this organization indicates very clearly that its most important function is the distribution of books and pamphlets in order to influence legislation directly and indirectly. It attempts to influence legislation directly by sending copies of books, pamphlets, and other printed materials to Members of Congress. It attempts to influence legislation indirectly by distributing hundreds of thousands of copies of these printed materials to people throughout the United States.

\* \* \* \* \* \*

"The distribution of printed material to influence legislation indirectly by influencing public opinion is the basic function of the Committee for Constitutional Government. \* \* \*"

And again the Committee said:

"These leaflets and memoranda, coupled with the books themselves, are evidence that their distribution by the Committee for Constitutional Government, Inc., constitutes an attempt by that organization to influence legislation, directly or indirectly."

The following colloquy occurred between Rumely and counsel for the Committee and typifies the nature of the hearing:

"Mr. Rumely. The Road Ahead, I have told you all along, we put out 600,000. I am not going to give you the names of the people who bought it.

"Mr. Fitzgerald. Don't you feel The Road Ahead deals with specific legislation?

"Mr. Rumely. The Road Ahead deals with stopping the march into socialism and the destruction of our form of government.

"Mr. Fitzgerald. I think that the true significance of the Road Ahead can be obtained only by reading it in its entirety, and I respectfully suggest that the committee read it. It condemns practically all of the social legislation which has been passed by the Roosevelt and Truman administrations, and opposes practically all of the present legislative program of President Truman. However, it does deal with specific legislation from time to time.

"For example, it deals with the war powers. On page 158 it states: 'We must curb the grasping hand of the Federal Government. We must restrain the grasping hand of the Executive. And our very first step must be to make a list of the emergency powers granted to the Executive for war purposes and then repeal every one of them.'"

In its Report the Committee also suggested that refusal to submit pertinent financial records might cover subterfuges to evade the Federal Regulation of Lobbying Act, i. e., to mask contributions as purchases. We shall discuss that suggestion in a moment.

The trial of Rumely was a comparatively simple proceeding. The prosecutor presented evidence that Rumely had registered under the Lobbying Act, that the Committee had been created by Resolution, and that the subpoenas had been served. He verified certain extracts (from pages 17, 18, 19, 20, 126, 166, 271, 272 and 273) from the transcript of the Committee hearings, which showed that Rumely refused to give the names and addresses of purchasers of books. He presented a certified copy of the Report of the Committee to the House. The defense presented Rumely and four character witnesses. Rumely described his efforts to comply with the subpoenas and verified his refusal to give the names of the purchasers of the books. Counsel for the defense made a detailed and extensive proffer of evidence, which was excluded from the jury by the court but accepted in part for the court itself on the question of pertinency. On cross examination Rumely asserted some half dozen times that he refused to give the names of purchasers of books.

The theory of the prosecution, adopted as correct by the court, was that, so long as Rumely refused to give a part of the subpoenaed data, all else was immaterial. The court instructed the jury that the Buchanan Committee was validly consti-

tuted and had jurisdiction over the matters under consideration; that the records subpoenaed were pertinent; that the Committee had a reasonable basis for issuing the subpoenas; that the subpoenas were validly issued; and that it made no difference what records were supplied so long as some were not supplied.

We turn first to that portion of the Buchanan Committee's Report which suggests that the Committee was seeking to ascertain whether subterfuges were being used to evade the Lobbying Act. It is clear to us that the point is not in the case as it was tried and as it is here. The statement of the Committee was that "Because of the refusal of the Committee for Constitutional Government, Inc., to produce pertinent financial records, this committee was unable to determine" whether the Lobbying Act requires amendment to prevent subterfuges. But, as the case comes to us, there was no refusal to produce financial records. Over and over again Rumely asserted before the Committee that he had given, and was willing to give, all records except the names and addresses of the purchasers of the books. No contention was made at those hearings that he refused to give anything else. Upon the trial the prosecutor did not say that anything else was refused. On the contrary, he urged a different view. He insisted, and the court sustained his view, that, so long as the names of purchasers of books were not given, financial records on contributions and loans were immaterial to the issues in the case. But they could not be immaterial if the issue was the inability of the Committee to probe subterfuges "Because of the refusal of [Rumely] to produce pertinent financial records". The Government did not rest this case upon that premise. The pertinency of the question which Rumely refused to answer was a contested issue upon the trial. The prosecutor's contention was that pertinency was established when it was shown that Rumely had registered as a lobbyist. Certainly, if the pertinency of the question rested even in part upon the Committee's desire to probe into possible subterfuges, the financial records would have been relevant and material.

The prosecutor urged and the court held that the financial data was inadmissible.

It is now said that contributions might be disguised by being made in the form of purchases of books. It is difficult to see how the purchase of a book at a dollar could be a contribution if it cost a dollar to produce the book. If the sales prices of the books exceeded the production costs in such amounts as to result in sizable profits, that fact would show in the financial records; the names of the purchasers would shed no light on that problem. No suggestion of this sort was made upon the trial or in the briefs before us.

██ It is said that the names of the purchasers of the books were pertinent, since the Committee might wish to question those persons as to possible subterfuges. That pertinency was too remote on this record to sustain an abridgment of the freedoms of speech and press. Subterfuges would appear, as the Committee itself evidently thought, upon examination of the financial records. Those records were not even admitted in evidence. Had they been admitted, and had they been suspected of being false, some further inquiry might have been in order. But no such issue was raised in this case. On a record such as this, so slim a semblance of pertinency is not enough to justify inquisition violative of the First Amendment. We are also of opinion that, even if the purchases were really contributions but were merely in furtherance of an effort to influence public opinion, they were beyond the power of the Congress and of the Committee under its Resolution, a subject which we shall discuss in a moment. No mention of a purpose to probe disguised contributions appears in the Government's brief before us.

The view of the Buchanan Committee, as reflected in such portions of its hearings as are before us, and that of the prosecutor, the trial court, and the Government in its brief and argument here, is that the publication of books upon national issues is indirect lobbying, that sending books and bulletins to Congressmen is direct lobbying, and that the Buchanan Committee had authority to investigate lobbying, direct and indirect.

That is the controversy before us, as we see it.

Appellant presents two principal contentions. He insists that the Buchanan Committee had no power to require him to produce or to reveal the names of purchasers of books, on two grounds, (1) that the Congress had no constitutional power to make that inquiry and (2) that the House had not by its Resolution empowered the Committee to make that inquiry. Both contentions were available to him.[5]

■ We begin this consideration with basic premises. To attempt to influence public opinion upon national affairs by books, pamphlets and other writings is one of the fundamental freedoms of speech and press. Congress has no power to abridge those freedoms unless urgent necessities in the public interest require it to do so. We examined this matter at length in Barsky v. United States.[6] In that case it was shown that the President and other responsible Government officials had, with supporting evidentiary data, represented to the Congress that Communism and the Communists are, in the current world situation, potential threats to the security of this country. For that reason, and for that reason alone, we held that Congress had the power, and a duty, to inquire into Communism and the Communists.[7] The doctrine

has since been clarified and sharpened by the Supreme Court.[8] At the same time, the Supreme Court, by numerous expressions, both before and after the Barsky decision, has made clear the inviolability of the fundamental freedoms in the absence of some such public necessity.[9]

■ That Congress has no power in respect to efforts to influence public opinion rests upon two bases. First, Congress is a representative body. It represents the people, and its power comes from the people. It is not a source or a generator of power; it is a recipient and user of power. As a representative it has no inherent authority to interfere with the thought or wishes of its principal, and the people have not conferred that authority upon their representative, the Congress. So that, even if there were no prohibition such as the First Amendment in the Constitution, Congress would lack authority to abridge either public opinion or efforts to influence that opinion. Second, the First Amendment is a direct prohibition upon the Congress. It reads: "Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The Congress cannot legislate concerning "all activities intended to influence, encourage, promote,

5. McGrain v. Daugherty, 1927, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580.

6. 1948, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied, 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767.

7. The decisions of this court in Dennis v. United States, 1948, 84 U.S.App.D.C. 31, 171 F.2d 986, affirmed, 1950, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734; Lawson v. United States, 1949, 85 U.S.App. D.C. 167, 176 F.2d 49, certiorari denied, 1950, 339 U.S. 934, 70 S.Ct. 663, 94 L. Ed. 1352; Morford v. United States, 1949, 85 U.S.App.D.C. 172, 176 F.2d 54, reversed on other grounds, 1950, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815, 1950, 87 U.S.App.D.C. 256, 184 F.2d 864, certiorari denied, 1950, 340 U.S. 878, 71 S.Ct. 120, 95 L.Ed. 638; and Marshall v. United States, 1949, 85 U.S.App. D.C. 184, 176 F.2d 473, certiorari denied, 1950, 339 U.S. 933, 70 S.Ct. 663, 94 L.Ed. 1352, rested upon the same necessities of national security.

8. Compare Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Communications Ass'n v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L. Ed. 925, and Adler v. Board of Education, 1952, 342 U.S. 485, 72 S.Ct. 380, with Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

9. Stromberg v. California, 1931, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117; Near v. Minnesota, 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Grosjean v. American Press Co., 1936, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; De Jonge v. Oregon, 1937, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Schneider v. State, 1939, 308 U.S. 147, 60 S.Ct. 146, 84 L. Ed. 155; Niemotko v. Maryland, 1951, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280, and Kunz v. New York, 1951, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280, and cases cited therein.

or retard legislation", or activities designed, in the language of the Buchanan Committee, "to influence legislation indirectly by influencing public opinion". If Congress had authorized its Committee to inquire generally into attempts to influence public opinion upon national affairs by books, pamphlets, and other writings, its authorization would have been void.

■ To publicize or to report to the Congress the names and addresses of purchasers of books, pamphlets and periodicals is a realistic interference with the publication and sale of those writings. This is another problem which we examined in the Barsky case, supra, and we there held that the public inquiry there involved was an impingement upon free speech. We are of the same view here. There can be no doubt, in that case or in this one, that the realistic effect of public embarrassment is a powerful interference with the free expression of views. In that case the tenets of Communism and the apparent nature of the Communist Party created a public necessity for congressional inquiry. In the case at bar no such dangerous factors are represented to us. There is no suggestion that the publication or distribution of these books and documents constitutes any public danger, clear or otherwise, present or otherwise.

In support of the power of Congress it is argued that lobbying is within the regulatory power of Congress; that influence upon public opinion is indirect lobbying, since public opinion affects legislation; and that therefore attempts to influence public opinion are subject to regulation by the Congress. Lobbying, properly defined, is subject to control by the Congress, a matter we shall discuss in a moment. But the term cannot be expanded by mere definition so as to include forbidden subjects. Neither semantics nor syllogisms can break down the barrier which protects the freedom of people to attempt to influence other people by books and other public writings. Such logic as the contention possesses falls before the realities of the protected freedoms.

It is said that lobbying itself is an evil and a danger. We agree that lobbying by personal contact may be an evil and a potential danger to the best in legislative processes. It is said that indirect lobbying by the pressure of public opinion on the Congress is an evil and a danger. That is not an evil; it is a good, the healthy essence of the democratic process. It is said that the financing of extensive efforts to influence public opinion is an evil and a danger. As to that, generalities are inaccurate. If influences upon public opinion were being bought and prostituted, an evil might arise. But the case before us concerns the public distribution of books and the formation of public opinion through the processes of information and persuasion. There is no evil or danger in that process. To fail to recognize the difference between that which threatens the national security and that which is, or may be, merely evil is to fail to recognize realities.

■ With these considerations in mind we turn to the House Resolution which was the authority of the Buchanan Committee. The House of Representatives did not purport to confer upon the Buchanan Committee power to investigate all activities intended to influence, encourage, promote or retard legislation. The Resolution of authority limited the Committee's inquiries to "lobbying" activities. "Lobbying" is a word of common meaning. The verb "lobby" means, according to the Oxford English Dictionary, 1933, "To influence (members of a house of legislature) in the exercise of their legislative functions by frequenting the lobby. Also, to procure the passing of (a measure) *through* Congress by means of such influence." Other dictionaries give similar meanings. The Supreme Court discussed a contract for "lobby service" in Trist v. Child [10] and used the term "personal solicitation" as descriptive of it. "A lobbyist", said the Circuit Court in Burke v. Wood,[11] "is defined to be one who frequents the lobby or the precincts of a Legislature or other deliberative assembly with the view of influencing the

10. 1875, 21 Wall. 441, 88 U.S. 441, 22 L. Ed. 623.

11. C.C.S.D.Ala.1908, 162 F. 533, 537.

views of its members." In the past a difference between lobbying and "purely professional services" in acquainting a legislature with the merits or demerits of measures was recognized at the law. The Supreme Court discussed it in Trist v. Child, supra, and in Marshall v. Baltimore & Ohio R. R.,[12] both of which cases it discussed in Oscanyan v. W. R. Arms Co.[13] Similar discussion appears in Lucas v. Wofford,[14] Ewing v. National Airport Corporation,[15] and Noonan v. Gilbert.[16] It may be that the line between lobbying in its pristine sense and proper professional service is too shadowy to serve as a limiting barrier to the regulatory power of the Congress. We do not have that question here, and, however that may be, Congress was certainly aware of the common meaning of the words "lobbying activities" when it used them in conferring authority upon the Buchanan Committee. At the most, the words depict no more than representations made directly to the Congress, its members, or its committees.

■ Lobbying, as thus or similarly defined, is within the regulatory power of the Congress and the terms of the Resolution. The influencing of legislative processes by contacts with legislators is potentially, although by no means necessarily or universally, a danger to the free and proper exercise of the legislators' functions. As such it is subject to inquiry by the legislature and to protective restrictions. Congress has a duty to protect the free flow from the people of influence, encouragement, promotion and retardation of legislative matters. So Congress has the right to restrict "lobbying" as properly defined, since such lobbying may, unless controlled, impede the effectual exercise of the people's power. But Congress has no authority to impede the exercise of those functions of and by the people.

There is some justification for the argument that the House intended the words "lobbying activities" in its Resolution to encompass the full scope of the Regulation of Lobbying Act.[17] The terms of that Act apply to any person who receives money to be used for either of two purposes, the second purpose being "To influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States." [18] We do not have before us in this case either the meaning or the validity of the Lobbying Act and so are neither called upon nor empowered to decide those questions as such. A three-judge statutory court in this jurisdiction, composed of Circuit Judge Wilbur K. Miller and District Judges Schweinhaut and Holtzoff, has unanimously declared Sections 303 to 307 of the Lobbying Act to be unconstitutional.[19] We have already said enough to indicate that at least a serious constitutional question would arise if the House Resolution were to be interpreted to include 'the broad powers claimed for it by the Committee. The Resolution should be interpreted to avoid that doubt.

We are of opinion that the term "lobbying activities" in the House Resolution must be held to mean lobbying in its commonly accepted sense, and did not purport to convey power to investigate efforts to influence public opinion.

■ We are of opinion that the demand made upon appellant for the names of purchasers of books from his concern was outside the terms of the authority of the Buchanan Committee, since the public sale of books and documents is not "lobbying".

It may or may not be that, if members of the Congress were receiving gratuitously and anonymously copies of books or documents dealing with matters pending before them but also circulated generally in the public market, the Congress would be en-

12. 1853, 16 How. 314, 57 U.S. 314, 14 L. Ed. 953.

13. 1881, 103 U.S. 261, 26 L.Ed. 539.

14. 5 Cir.1931, 49 F.2d 1027.

15. 4 Cir.1940, 115 F.2d 859, certiorari denied, 1941, 312 U.S. 705, 61 S.Ct. 828, 85 L.Ed. 1138.

16. 1934, 63 App.D.C. 30, 68 F.2d 775.

17. Supra note 3.

18. Sec. 307(b) of the Act, 60 Stat. 841, 2 U.S.C.A. § 266(b).

19. National Association of Manufacturers v. McGrath, D.C.1952, 103 F.Supp. 510.

titled to inquire as to the identity of the donors. The question presented by such a situation might be a difficult one, but the controversy before us is not drawn along those lines. Had Rumely been asked merely for the names of persons who anonymously financed the presentation of books or pamphlets to members of Congress, a different problem would be here. But he was not asked that question; he was asked and refused to give all the names of purchasers of books in amounts of $500 or more.

In this connection we are inclined to observe further that anonymous donations of printed material to Congressmen appear to be a danger too insignificant to support abridgment of freedoms of speech, press and religion. Members of Congress need read only that which they want to read. The force behind the writing is the author, not the donor. And, moreover, the wastebasket is an invincible protector against harm by such means. "Lobbying" by personal contact is a different and more dangerous activity.

It is clear that authority over a subject matter does not import authority over all activities of persons concerned in that subject matter. Especially is it true that power over a subject matter involving speech, press, religion, assembly and petition does not go beyond the power to do that which is essential to be done in protection against a public danger. Many lawyers, businessmen, and others are required, and properly, to be in contact with legislators concerning legislation. And so they may be subject to regulation and open to inquiry concerning that activity. But the power of inquiry which arises from that reason does not strip from all other activities of those persons the rights which inhere in them and which are protected in terms by the First Amendment.

The scope of the power of legislatures to compel testimony in the course of investigation has been the subject more of comment by legal writers[20] than of interpretation by federal courts.[21] The Supreme Court had no occasion to consider the existence of such a power until 1881, in Kilbourn v. Thompson,[22] and then the decision rested upon the view that the inquiry was not in aid of any law-making function, the Court expressly reserving the question whether the power to inquire existed. Meanwhile, however, two well-considered state court opinions were rendered: one a Massachusetts case, Burnham v. Morrissey,[23] in which, on the facts of the case, the assertion of the existence of the power may be said to be *dictum;* and the other a New York case, Keeler v. McDonald,[24] in which the decision rested squarely upon the existence of the power. Both of those cases and other state cases were considered by the Supreme Court when in 1927 it was faced with the question in McGrain v. Daugherty.[25] They were adopted as the rationale of that decision. The principles developed in the foregoing cases were matured in Sinclair v. United States.[26] Explicit in that decision is recognition of "the purpose of the courts well to uphold the

20. See, e. g., Dimock, Congressional Investigating Committees, 47 Johns Hopkins Univ. Studies in Hist. and Political Science No. 1 (1929); Eberling, Congressional Investigations (1928); 1 Wigmore, Evidence § 4k (3d ed. 1940); 8 id. § 2195; Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv.L.Rev. 153 (1926); Hamilton, The Inquisitorial Power of Congress, 23 A.B.A.J. 511 (1937); Cousens, The Purposes and Scope of Investigations Under Legislative Authority, 26 Geo.L.J. 905 (1938); Herwitz and Mulligan, The Legislative Investigating Committee, 33 Col.L.Rev. 1 (1933); Potts, Power of Legislative Bodies to Punish for Contempt, 74 U. of Pa.L.Rev. 691, 780 (1926); 40 Geo.L.J. 137 (1951).

21. Cases involving the question come before the courts in a variety of ways: in prosecutions under 2 U.S.C.A. § 192, as here; in *habeas corpus* proceedings; in tort actions for false imprisonment.

22. 103 U.S. 168, 26 L.Ed. 377.

23. 1859, 14 Gray 226.

24. 1885, 99 N.Y. 463, 2 N.E. 615.

25. 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580.

26. 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L. Ed. 692.

right of privacy".[27] The Court, illustrating its concern in that respect, referred to cases[28] involving the power of Congress-created agencies to examine into private affairs, and quoted approvingly from a number of those opinions to show its care lest governmental inquiries abridge fundamental freedoms. The gist of the decision in the Sinclair case was that, since Congress had plenary power over federal property, it could ask questions about naval oil reserves.

Of course the publishers of books are not immune from law. This is the purport of the cases holding publishers and news agencies subject to laws of various sorts.[29] That is not the problem before us. Here the power claimed by the Committee is a power to inquire into the sale of books because those books attempt to influence public opinion. In its opinions dealing with regulations imposed upon the press,[30] the Supreme Court has been most careful to point out that the regulations upheld did not bear upon the freedom of publication except to the extent that ordinary business burdens bear upon the publishing business.

■ Our attention is directed in alarm to the vast operations of Rumely's organization. We are referred to "indirect lobbying techniques" and to modern methods of lobbying. We are told that modern media for mass communication have made established concepts of lobbying archaic. We are told that there should be a reference source where full material concerning those who would influence public opinion could be had, and that organized groups who attempt to influence public opinion must be dealt with by Congress. None of these flourishes withstands scrutiny. Rumely's vast operations turn out to be the quantities of books and pamphlets which his organization distributes to the public. What is

called a new lobbying technique turns out to be aroused public opinion. The new features are new mechanics of communication and new mass interest in the minutiae of congressional activities. But speech and press by these new means—on the radio, on television, and in the movies—are freedoms protected by the First Amendment. And the public policy which prohibits any current congressional membership from abridging the impact of public opinion upon the Congress is as sound today as it was when it was first formulated. If it be true that those who today would influence legislation turn from the buttonholes of the legislators to the forum of public opinion for support, a great good in the cause of representative government has been done. The evil to be dealt with is at the buttonhole, not in the arena of public discussion, whether that discussion be oral or written, over the air or on printed pages. These are basic principles of our concept of government. If we ever agree that modern mechanical devices and modern mass interest in public affairs have destroyed the validity of those principles, we will have lost parts of the foundation of the Constitution.

■ The Government says that pertinency in this case was sufficiently shown by the fact that appellant had registered under the Federal Lobbying Act, even though under protest. The claim is startlingly broad. If valid, it would mean that all the affairs of any person who represented another in respect of legislation would be open to inquiry. But, as we have indicated, "pertinent", as used to describe a requisite for valid congressional inquiry, means pertinent to a subject matter properly under inquiry, not generally pertinent to the person under interrogation. Moreover, this appellant registered under protest. Surely

27. Id., 279 U.S. at page 292, 49 S.Ct. 268.

28. Interstate Commerce Commission v. Brimson, 1894, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047; Harriman v. Interstate Commerce Commission, 1908, 211 U.S. 407, 29 S.Ct. 115, 53 L.Ed. 253; United States v. Louisville & N. R. R., 1915, 236 U.S. 318, 35 S.Ct. 363, 59 L. Ed. 598; Federal Trade Comm. v. American Tobacco Co., 1924, 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696; In re Pacific Ry. Comm., C.C.N.D.Cal.1887, 32 F. 241.

29. Associated Press v. Labor Board, 1937, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; Oklahoma Press Pub. Co. v. Walling, 1946, 327 U.S. 186, 66 S.Ct. 494, 90 L. Ed. 614.

30. E. g., cases cited ibid.

those cautious souls who register rather than risk the severe penalties of the Lobbying Act do not by that mechanical act waive all rights protected by the First and Fourth Amendments. We think this position of the Government not tenable.

The Government cites cases under the Federal Corrupt Practices Act, 2 U.S.C.A. § 241 et seq. That subject must be considered in the light of the opinions in United States v. C.I.O.[31] We need not here repeat or attempt to summarize those opinions. They are pertinent in full text to this contention of the Government.

It is our view that the Resolution of the House which created the Buchanan Committee and gave it power to investigate "lobbying activities" did not confer the power which the Committee claimed in its demand upon appellant and which the Government upon this appeal claims for it, relating to the identity of the purchasers of books from his company. Appellant Rumely was within his rights when he refused to supply the information involved in the trial upon the indictment.

■ We think our dissenting judge discusses a case which is not before us—issues not presented in the trial court or here, and facts not in evidence in this record. The transcript of the hearings and the exhibits, including letters, etc., before the Buchanan Committee was neither offered nor admitted in evidence, except in so far as portions were reproduced in the Report to the House and in so far as a few excerpts were read to the jury. The agreement between counsel at the opening of the trial that the transcript was a correct transcript and that neither the reporter nor his shorthand notes need be resorted to, was no substitute for the presentation of evidence, and it did not purport to be. When the prosecutor wanted a portion of the hearings in evidence he said so. Thus he said, " * * * I should like to offer so much of it in evidence as is contained on pages 17, 18, 19 and a third of the way down on page 20, and read it to the jury at this time." And again he said, "At this time, Your Honor, I would like to offer in evidence almost a complete page of testimony of the hearings commencing on page 271 * * *." Certainly, in a criminal case we cannot take judicial notice of things the defendant is alleged to have said or done, not shown or offered to be shown in evidence; in fact, no request for such notice was made either in the trial court or before us. Nor can mere conclusions of the Committee serve in the place of such evidence. We repeat that the controversy before us is whether the sale of a book, such, for example, as "The Road Ahead", is "indirect lobbying" because it deals with national issues, and, if so, whether the sale is within the scope of the investigative power of the Committee or of the Congress.

Appellant raises other questions respecting rulings of the trial judge during the course of the trial. We find it unnecessary to consider them.

The judgment of the District Court is reversed, and the case will be remanded with instructions to dismiss the indictment.

Reversed and remanded.

BAZELON, Circuit Judge (dissenting).

Edward R. Rumely, the appellant, was ordered to appear before the House Select Committee on Lobbying Activities[1] to testify with regard to the Committee on Constitutional Government[2] of which he is Executive Secretary. The Buchanan Committee's mandate was

> " * * * to conduct a study and investigation of * * * all lobbying activities intended to influence, encourage, promote, or retard legislation * * *."[3]

It was interested in learning how the CCG and Rumely—both registered under the

---

31. 1948, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849.

1. Hereafter referred to as the Buchanan Committee.

2. Hereafter referred to as CCG.

3. H.Res.298, 81st Cong., 1st Sess. (Aug. 12, 1949), printed in Hearings before House Select Committee on Lobbying Activities, 81st Cong., 2d Sess., pt. 1, p. 1 (1950) (hereafter cited as Hearings), and also J. A., p. 188.

Federal Regulation of Lobbying Act[4]—operated, where the organization's funds came from, etc., in order to determine whether there was anything in its activities and those of other organizations which might require revision of existing lobbying laws.

As a part of this investigation, the Buchanan Committee sought to ascertain whether so-called purchases of books and pamphlets from the CCG for amounts of $500 or more were really disguised contributions—a device to evade those sections of the Lobbying Act which require "any person * * * who * * * receives money * * * to be used principally to aid * * * [t]he passage or defeat of any legislation by the Congress of the United States [or] [t]o influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States"[5] to report to the Clerk of the House of Representatives "the name and address of each person who has made a *contribution of $500 or more*."[6] This phase of the inquiry revealed that shortly after the statute was enacted and the appellant and the CCG had registered thereunder the CCG had changed its pattern of financial support. Its new policy was to reject and return "contributions" in excess of $490[7] unless the remittor designated "the material purchased and the direction of its distribution."[8] Rumely admitted that this policy was adopted "[t]he moment the [lobbying] law went into effect,"[9] and because "[w]e didn't want to get into the position of reporting our contributors."[10]

It was in the light of these admissions and the Buchanan Committee's desire to learn the financial sources which were making possible the vast operations of CCG[11]

4. 60 Stat. 839, 2 U.S.C.A. § 261. Registration was under protest, J.A., p. 182, apparently on the theory that the CCG was a "publisher," rather than a lobbying organization, Brief for Appellant, pp. 14–16, and did not have as its principal purpose "[t]o influence, directly or indirectly, the passage or defeat of any legislation." 60 Stat. 839, 841, 2 U.S.C.A. § 266.

5. Ibid.

6. 60 Stat. 839, 840, 2 U.S.C.A. § 264(a)(1). Emphasis supplied. See H.R.Rep. No.3024, 81st Cong., 2d Sess. 1–3 (1950), (hereafter cited as H.R.Rep.No.3024) which is a part of the record in this case as Government Exhibit No. 4.

7. Id. at pages 1–3, 9.

8. Letter of Jan. 17, 1950, from Sumner Gerard, Treasurer, Committee for Constitutional Government, to Mr. E. L. Noyes, Eli Lilly & Co., printed in Hearings pt. 5, p. 32; reproduced in note 31, infra.

9. Hearings pt. 5, p. 37.

10. Id. at page 29. See also id. at pages 37, 42. H.R.Rep.No.3024 states, at page 2: "Of particular significance is the fact that Edward A. Rumely and the Committee for Constitutional Government, Inc., in recent years have devised a scheme for raising enormous funds without filing true reports pursuant to the provisions of the Federal Regulation of Lobbying Act. This scheme has the color of legality but in fact is a method of circumventing the law. It utilizes the system * * * whereby contributions to the Committee for Constitutional Government are designated as payments for the purchase of books, which are transmitted to others at the direction of the purchaser, with both the contributor of the money and the recipients of the books totally unaware of the subterfuge in most cases."

The theory behind this arrangement was, of course, that the names of "purchasers of books" for amounts of $500 or more need not be reported under the Lobbying Act whereas "contributors" giving $500 or more would have to be disclosed.

11. The nature of the CCG operation was one that required large amounts of money. H.R.Rep.No.3024 points out, at page 1, that Rumely and the CCG "* * * have registered and reported as lobbyists under the Federal Regulation of Lobbying Act since October 7, 1946. Since that date the Committee for Constitutional Government, Inc., has reported spending approximately $2,000,-000. One of the chief functions of the Committee for Constitutional Government, Inc., is the distribution of books and pamphlets presenting one side of national legislative issues. In the period 1937 to 1944, prior to the enactment of the Federal Regulation of Lobbying Act of 1946, the Committee for Constitutional Government, Inc., distributed some 82,-000,000 booklets, pamphlets, and other pieces of literature, or at the rate of

that it asked Rumely for the names of "purchasers" of $500 or more of CCG's books and pamphlets. Apparently the Buchanan Committee wanted to question these people in the process of further establishing that some were not bona fide purchasers but merely heavy contributors to the lobbying activities of which CCG was the focal point. It was at this juncture that Rumely and the Buchanan Committee came to loggerheads. Because Rumely refused to disclose the names requested, he was afterwards cited for contempt of Congress.[12]

The scope of a congressional committee's investigation is limited by statute to matters pertinent to the inquiry authorized by Congress. And "[t]he question of pertinency * * * [is] one of law."[13] The trial court instructed the jury as a matter of law that the Buchanan Committee

"was a validly constituted committee of Congress; that said committee had jurisdiction over the matters under consideration; that the records and information requested, as alleged in Counts 1 and 6, and the question asked, as alleged in Count 7, were pertinent thereto * * *."[14]

The jury then found Rumely guilty of contempt of Congress.

Before discussing the broader issues presented by this appeal, I turn for a moment to consider a narrower aspect of the case. It has to do with the Government's reliance upon the fact that both Rumely and the CCG had registered under the Lobbying Act to establish the pertinency to the inquiry of the information sought by the Buchanan Committee.[15] In rebuttal, Rumely showed that he and the CCG had registered under protest. He did not claim that registration was induced or coerced by any governmental source. I agree with the trial judge's ruling that proof of registration was a sufficient basis for establishing the pertinency of the information sought. I think it reasonable to conclude that by registering Rumely and the CCG recognized the possibility, at least, that their activities might be found to constitute attempts "[t]o influence, directly or indirectly, the passage or defeat of any legislation." It can hardly be said that the Buchanan Committee was without power to inquire into the operation of the Lobbying Act and to determine whether the Act does or should reach the activities of a registrant. Clearly pertinent—in fact, vital—to such an inquiry was the information concerning the source and pattern of CCG's financial support.[16]

about 12,000,000 pieces a year." This material was sent to "every type of [mailing] list," Hearings pt. 5, p. 93, of "opinion molders" including clergymen, labor and farm leaders, educators, governors and legislators, doctors, journalists, business executives and millionaires. Id. at 95. Much of this material, Rumely admitted, was sent out under congressional frank. Letters written by Rumely indicated that one CCG technique was to have some member interested in a particular subject and statement introduce it into the Congressional Record. Id. at 98–102, 106–7. The Congressman then ordered a number of copies designated by the CCG to be printed by the Government Printing Office. And since the CCG could not draw a check to the Government Printing Office, payment was made to the Congressman who in turn remitted to the Government Printing Office. Id. at 97–107. Rumely admitted sending 2,-800,000 pieces out under frank in 1949, id. at 101, and eight to ten million between the passage of the Lobbying Act

and the Buchanan Committee investigation. Id. at 97–8. In addition to the flood of pamphlets, the CCG published millions of books, as indicated in the majority opinion of the court.

12. Rumely was also indicted for refusing to disclose the identity of a woman from Toledo who gave CCG $2,000 for the distribution of "The Road Ahead." J.A., pp. 4, 32.

13. Sinclair v. United States, 1929, 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692.

14. J.A., p. 175.

15. J.A., pp. 40–2.

16. "Because of the refusal of the Committee for Constitutional Government, Inc., to produce pertinent financial records, this committee was unable to determine whether or not the Committee for Constitutional Government, Inc., is evading or violating the letter or the spirit of the Federal Regulation of Lobbying Act by the establishment of class or contribu-

Although the fact of registration alone was sufficient to establish pertinency, the Buchanan Committee Report 'Citing Edward A. Rumely which was made a part of the record in this case, makes it clear that the questions which Rumely refused to answer were pertinent to the legislative inquiry. In addition, the Buchanan Committee hearings, which were only partially introduced in the trial record, support this conclusion.[17] Since judicial notice can be taken of congressional hearings, there is no reason why an appellate court "should not advise itself from outside the record of such facts as appear to admit of no genuine dispute".[18] As will appear, the evidence adduced before the Buchanan Committee furnishes both supplementary and independent grounds supporting the trial court's ruling that the information sought was pertinent to the inquiry.[19]

Turning now to the broader issues of the case, appellant says, in substance, that (1) the House Resolution[20] did not undertake to authorize any inquiry to which the requested information would be pertinent; (2) the requested information was beyond the constitutional limits of legislative inquiry; and (3) compulsory disclosure of this information would violate First Amendment rights.

(1) This court says that, by definition or common understanding, the words "all lobbying activities," which House Resolu-

---

tions called 'Receipts from the sale of books and literature,' or whether they are complying with a law which requires amendments to strengthen it.

"The policy of the Committee for Constitutional Government, Inc., of refusing to accept contributions of more than $490 unless earmarked for books, etc., may also involve: (1) Dividing large contributions into installments of $490 or less, and causing the records of the Committee for Constitutional Government to reflect receipt of each installment on a different date, and/or causing the records of the Committee for Constitutional Government to give credit, for the several installments, to various relatives and associates of the actual contributor. (2) Causing the Committee for Constitutional Government's records as to 'Contributions' to reflect less than the total amount of contributions actually received, by labeling some part of such funds as payments made for printed matter.

"Because of the refusal of the Committee for Constitutional Government, Inc., to produce pertinent financial records, this committee was unable to determine whether or not the Federal Regulation of Lobbying Act requires amendment to prevent division of large contributions into installments, or to prevent the crediting of contributions to others than the real contributor, or to prevent the use of other subterfuges." H.R.Rep. No. 3024, pp. 2–3.

17. While the hearings insofar as they pertain to Rumely and the CCG, were not made a part of the record in their entirety, they were filed with the trial court, under the conditions agreed to in the following colloquy:

"Mr. Hitz [Government Counsel]: I may say, Your Honor, that for the purposes of this trial it has been agreed between Mr. Burkinshaw and myself that the two volumes, Part 4 and Part 5 of the hearings, insofar as they relate to Mr. Rumely, are correct and we will not go to the reporter or to any shorthand notes for that purpose. Is that right?

"Mr. Burkinshaw [Counsel for Rumely]: That is right, absolutely."

18. United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 445; see also United States v. Darby, 1941, 312 U.S. 100, 109, 61 S.Ct. 451, 85 L.Ed. 609; Overfield v. Pennroad Corporation, 3 Cir., 1944, 146 F.2d 889, 898.

19. "This court has repeatedly held—and it is not alone in so holding—that a judgment need not be affirmed solely upon the ground that seemed controlling to the lower court. A fortiori, this court is not bound by the theory urged by the successful litigant below. The rule might be otherwise, though we are not here so holding, if the appellant urged one ground in the court below, assigned error, and then changed his position on appeal. It might then be urged, perhaps, that the lower court should have been given the benefit of the appellant's theory, and thus possibly have avoided the alleged error." Wagner v. United States, 9 Cir., 1933, 67 F.2d 656, 657; cf. Smith v. United States, 9 Cir., 1949, 173 F.2d 181, 185.

20. H.Res. 298, 81st Cong., 1st Sess. (Aug. 12, 1949), printed in Hearings pt. 1, p. 1, and also J. A., p. 188.

tion 298 authorized the Buchanan Committee to investigate, refer only to "representations made *directly* to the Congress, its members, or its committees."[21] I think this definition unduly narrow. Lobbying has had a broader sense for at least forty years. The court's constricted concept of lobbying provides the premise for its conclusion that questions with regard to *indirect* lobbying techniques are not pertinent to an inquiry said by the court—but not by Congress—to be limited to *direct* representations to Congress. Since I think the court's basic premise incorrect, I must reject the conclusion built upon it.

As early as 1913,

"* * * House and Senate investigations * * * gave the first thorough airing to what might be properly called modern lobbying as we know it today. The Senate investigation was prompted by President Wilson's charge that an industrious and, as he called them, 'insidious body of tariff lobbyists,' was spending money without limit in an effort to create an impression of public opinion contrary to some of the chief items of the administration's sponsored Underwood tariff bill.

* * * * * *

"Each committee in its own way also concluded that even in 1913 lobbying consisted less of personal appeals to Congressmen than it did of organized efforts to mold public opinion and influence Congress by means of the artificially created public pressure."[22]

This trend, already apparent in the early part of the century, has since become accelerated. Present day means of communication, which have changed modes of living and the course of history, have also relegated the restrictive concept of direct "contacts with legislators" as a means of influencing legislation to the horse and buggy era. The appellant himself, in a pamphlet entitled "Needed Now—Capacity for Leadership, Courage to Lead," deprecated the value "of such old lobbying techniques as 'noisy delegations * * * which buttonholed legislators' and 'stunts which attract some popular attention but persuade no Congressmen.' "[23] Congress has long recognized that modern media for mass communication have brought with them the need for vigilant inquiry.[24] And in House debate on the very resolution under which the Buchanan Committee acted, Members of the House (1) specifically mentioned the CCG as being a large lobbying organization and (2) indicated that one aim of the investigation would be to determine how organizations, in reporting under the Lobbying Act, were allocating their expenses between legislative lobbying and "nonlegislative" or "noncongressional lobbying."[25]

21. Page 15, supra. Emphasis supplied.

22. Hearings pt. 1, pp. 54, 55.

23. This pamphlet is quoted in Hearings pt. 5, p. 6.

24. To that end it has adopted "the principle of disclosure in both the economic and political spheres. The Securities and Exchange Commission, the Federal Trade Commission and the Pure Food and Drug Administration make available to the public information about sponsors of economic wares. In the political realm, the Federal Communications Commission, the Post Office Department, the Clerk of the House of Representatives, and the Secretary of the Senate—all of these under various statutes—are required to collect information about those who attempt to influence public opinion. Thousands of statements disclosing the ownership and control of newspapers using the second-class mailing privilege are filed annually with the Post Office Department. Hundreds of statements disclosing the ownership and control of radio stations are filed with the Federal Communications Commission. * * * In 1938, Congress found it necessary to pass the Foreign Agents Registration Act [22 U.S.C.A. § 611 et seq.] which forced certain citizens and aliens alike to register with the Department of Justice the facts about their sponsorship and activities. * * *"

"* * * [The Government] ought to provide a source of reference where private citizens and groups may find accurate information about the activities, sponsorship, and background of those who are active in the market place of public opinion." To Secure These Rights: The Report of the President's Committee on Civil Rights 52-3 (1947).

25. 1949, 95 Cong.Rec. 11386, 11389. See also the remarks of Congressman Buchanan at the opening of the inquiry. Hearings pt. 1, pp. 7-8.

Any concept of "lobbying activities" which ignores the realism of the day is an archaic one, bottomed either on outmoded dictionary definitions or on judicial constructions drawn from unrelated contexts.[26] I think Congress directed the Buchanan Committee to investigate indirect as well as direct lobbying techniques and that the information requested from Rumely was pertinent to such investigation.

(2) To say that modern methods of lobbying cannot be inquired into by virtue of the same power which permits legislative inquiry into the older and less effective methods would be to stifle the legislative process. Yet I understand appellant's contention to be that the information demanded by the Buchanan Committee was beyond the constitutional limits of legislative inquiry because no valid legislation could deal with indirect lobbying.

It is of course true that the area for legislating with respect to the whole lobbying problem is subject to constitutional limitations. This is merely another instance of the price we pay for the protection of things we deem far more valuable. But constitutional boundaries cannot be marked by the shotgun argument that no valid legislation could possibly emanate from a legislative inquiry to which the information sought here would be pertinent. As the Second Circuit said in United States v. Josephson:[27]

"* * * in substance [the contention] is that the Committee's power to investigate is limited by Congress' power to legislate; Congress is prohibited from legislating upon matters of thought, speech, or opinion; ergo, a statute empowering a Congressional committee to investigate such matters is unconstitutional. The mere statement of this syllogism is sufficient to

refute it. Congress obviously can use information gathered by this Committee to pass legislation not encroaching upon civil liberties, as above noted. The appellant's argument necessarily, therefore, is reduced to the absurd proposition that because the facts resulting from the Committee's investigations conceivably may also be utilized as the basis for legislation impairing freedom of expression, the statute authorizing such investigations must be held void."

We are not dealing here with the constitutionality of an act of Congress. Nor are we being asked to render an advisory opinion on the constitutionality of legislation which might conceivably be drafted at some time in the future. As this court said a few years ago in the Barsky case,[28] Congress was engaged here in a "preliminary inquiry [which] has from the earliest times been considered an essential of the legislative process. * * * Obviously, the possibility that invalid as well as valid legislation might ensue from an inquiry does not limit the power of inquiry; invalid legislation might ensue from any inquiry."

Congress, through the Buchanan Committee, was concerned with a perennial problem in our democracy—how to deal with highly organized pressure groups, and the distortions and evils they sometimes bring in their wake, and how to distinguish such groups from individual citizens petitioning their representatives. Neither direct nor indirect lobbying is an evil and a danger, but either can become so, if plainly or subtly dishonest methods are used to distort the legislative function. The court recognizes that this is true with respect to indirect lobbying when it says that "an evil might arise" "if influences upon public

26. For a discussion of modern lobbying techniques, see, e. g., Comment, Improving the Legislative Process: Federal Regulation of Lobbying, 1947, 56 Yale L. J. 304.

27. 1947, 165 F.2d 82, 90–91, certiorari denied 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122, rehearing denied, 333 U.S. 858, 68 S.Ct. 731, 92 L.Ed. 1138, motion for leave to file a second petition for rehearing denied 1948, 335 U.S. 899, 69 S.Ct. 294, 93 L.Ed. 434.

28. Barsky v. United States, 1948, 83 U.S. App.D.C. 127, 131, 167 F.2d 241, 245, certiorari denied 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767.

opinion were being bought and prostituted".[29] I reject the notion that because Congress may not constitutionally *prohibit* indirect lobbying activities, it is without power to provide any measure of protection for itself and the public from its abuse. And here, since the Buchanan Committee had strong reason to believe that the abuse had already arisen, the attending circumstances were clearly pertinent to its inquiry.

A convincing example to support that belief is found in the letter under date of January 10, 1950, from Eli Lilly & Co., a corporation manufacturing medicinal products, advising that their "budget committee had approved a *contribution*[30] of $25,000 to the CCG for the calendar year 1950"; and the CCG's reply thereto under date of January 17, 1950. These letters are reproduced in this margin.[31]

29. Majority opinion, p. 14.

30. Emphasis supplied.

31. Letter from E. L. Noyes, Eli Lilly & Co., Indianapolis, Indiana:
"January 10, 1950.
"Committee For Constitutional Government,
205 East Forty-Second Street,
New York 17, N. Y.
"Gentlemen: This is to advise you that our budget committee has approved a contribution of $25,000 to the Committee for Constitutional Government for the calendar year 1950.
"In approving this contribution, it was the consensus of opinion of our budget committee that we should like to have you use some of these funds in distributing books, pamphlets, Paul Revere messages, etc., to a mailing list which we will supply you with. Such a mailing list would include school teachers, members of the clergy, and other influential groups of our local community. Can you advise me as to how large a mailing list this contribution will supply with the educational material which your committee publishes?
"It is also our opinion that perhaps distribution of every publication to these individuals might be so excessive as to do more harm than good. The tendency might arise for these people to throw everything that comes in the mail into the nearest waste basket. Therefore, would it be possible, in case we so desire, to supply you with a mailing list and to have you mail to them only those publications which we designate.
"With all good wishes for a very successful year, I am
Sincerely yours,
E. L. Noyes."

Reply of Sumner Gerard, Treasurer, CCG:
"Committee for Constitutional Government,
January 17, 1950.
"Mr. E. L. Noyes,
Eli Lilly & Co., Indianapolis 6, Ind.

"My Dear Mr. Noyes: Your letter of January 10 announcing a $25,000 purchase of our educational material was a source of great encouragement to Dr. King and myself. Because of Mr. Gannett's frequently expressed admiration and friendship for you, we sent him a copy of your letter. On Monday morning, he telephoned from Miami Beach greatly pleased over this news.
"Your substantial purchase so early in the year will enable us to lift our committee's activities to higher levels of effectiveness. We have found that money put to work in January multiplies itself several fold during the year by bringing in additional support. This purchase of material should be charged on your books as an outright purchase and not as a contribution.
"The firm of Farabaugh, Pettengill, Chapleau & Roper have given us an opinion that such purchases of material to uphold our free-enterprise system are legitimate corporate expense, like other advertising, and the Treasury Department has accepted in hundreds of cases such expenditures as legitimate corporate purchases. When purchasing, it is necessary for the purchaser to do exactly what you suggest, namely to designate the material purchased and the direction of its distribution.
"We will service a list of 5,000 names at $4 per individual name 22 times between February and December 1950; or a list of 10,000 eleven times; or of 25,000 four times. In connection with this we will include the distribution of 5,000 copies of Norton's great book The Constitution of the United States: Its Sources and Its Application, and 3,000 copies of Pettengill's For Americans Only. We stand ready to cooperate with you in working out in detail, as may best suit your wishes, the servicing of such lists as you designate.
"We suggest that you set aside $8 per name for the full Paul Revere messages service to 300 including all State legislators in Indiana (150), the balance of 150 to go to names that you par-

To determine, *inter alia,* "if influences upon public opinion were being bought and prostituted,"[32] the Constitution permitted and Congress authorized a broad inquiry. The purpose of that inquiry was to find the problems, frame hypotheses for coping with them, and then, in the light of the facts brought out by the investigation, determine which hypotheses could best stand the test of experience, the Constitution and a vote in Congress. It cannot be seriously urged that every problem and every hypothesis must meet the test of constitutionality.

(3) If, as I believe, Congress had the power to and did authorize the Buchanan Committee's inquiry into indirect as well as direct lobbying activities, and that the particular questions in controversy here were pertinent to that inquiry, then in the absence of some constitutional privilege, appellant's refusal to answer was a contempt of Congress. Appellant claims such a privilege, resting his refusal of the requested information upon the lofty heights of the freedom of speech, press and petition guaranteed by the First Amendment. As I understand it, this claim is laid upon the factual premise that all amounts of $500 or more were received from persons who purchased the CCG's literature, rather than persons who used ostensible purchases to cloak what were actually contributions for which disclosure was required by the Lobbying Act. I think the Buchanan Committee Report Citing Edward A. Rumely and hearings make abundantly clear that this premise is untenable. I would there-

ticularly designate in your own organization or in the city of Indianapolis. We will include in this service a copy of the Norton book and a copy of Dr. King's The Keys To Prosperity which should have a special value to State legislators.

"With $20,000 for the mailings, $2,400 for this Paul Revere service to 300 names, there would be left $2,600. We would suggest that you set aside this amount, at $1 per copy, for 2,600 copies of Compulsory Medical Care and the Welfare State by Melchior Palyi. The report upon which this book is based was worked up at a substantial expenditure by the National Physicians Committee before it disbanded. We expect to have shortly 20,000 copies in book form, publication price $2. Our price to you will be $1 per copy.

"The contents of the book are of such great importance that distribution to key leaders in national thinking and in positions of public influence should be made soon. If you agreed to allot $2,600 to this distribution we will bear distribution cost and send to all Members of Congress, all Governors, to selected editors, newspaper columnists, and radio commentators, and to 600 of the top level leaders in the medical profession, including all officers of State medical associations.

"Any portion of this distribution where you desired it we would be glad to include your courtesy card as donor. Otherwise we shall distribute over the name of the committee itself. In the case of Palyi's book we shall seek some individual of public influence to write an accompanying letter calling attention to the book and its great importance. In the distribution to Congress we might have Congressman Smith himself—the head of a medical clinic and highly respected in both Houses of Congress—write the accompanying letter asking that every Member read the content. Please note copy of the telegram to members of the Rules Committee enclosed herewith.

"Our trustees will meet on January 25 and it would be a matter of great encouragement if we could have this transaction closed by that date.

"In the meantime, if you or any other member of your organization come to New York City, do give Dr. King and the other members a chance to exchange thought with you.

Sincerely yours,

Sumner Gerard, *Treasurer*."

These letters are reproduced in H.R. Rep.No.3239, 81st Cong., 2d Sess. 8–13 (1951), and are printed in Hearings pt. 5, pp. 32–3.

Congressman Buchanan also remarked: "I might say that the total amount of loans and contributions that you [Rumely] did furnish to the Committee aggregate a very small amount; in fact, I think it is about $25,000, in contrast to the very wide ramifications of conduct of your Committee for Constitutional Government, which, running as of the current quarter, will exceed $1,100,000 this year. I think that we have a right to know and have a right to seek that information." H.R.Rep.No.3024, p. 16.

32. Majority opinion, p. 14.

fore reject the claim of privilege of non-disclosure that rests upon it.

The Buchanan Committee Report Citing Edward A. Rumely and the hearings on House Resolution 298 disclosed, as summarized above,[33] that the CCG is a registered and well-financed Lobbying organization engaged in distributing propaganda material on a large scale. In addition to the activities which the court regards as indirect, CCG also engaged in direct lobbying.[34] Finally, the Report and hearings disclose that the CCG changed its pattern of financial support upon passage of the Lobbying Act because "[w]e didn't want to get into the position of reporting our contributors." It seems to me immaterial that among those from whom the CCG received $500 or more, there may have been some who had other motives than the influencing of opinion and legislation. In any reasonable view of the facts, it is clear that appellant and the CCG engaged in a course of conduct calculated to disguise lobbying contributions as purchases.

Congress has adopted the principle of disclosure as a means of preserving the integrity of the election process as well as the legislative process. Thus, for example, a recent enactment makes it unlawful to publish any pamphlet, advertisement, etc., relating to any person who has declared his intention to seek federal office unless the publication bears the name of the person responsible for its publication.[35] The Corrupt Practices Act requires the treasurer of a political committee to file with the Clerk of the House of Representatives "[t]he name and address of each person who has made a contribution to or for such committee in one or more items of the aggregate amount or value, within the calendar year, of $100 or more, together with the amount and date of such contribution."[36] In the only attack on the latter provision to reach the Supreme Court, First Amendment rights were not even discussed. Instead, the Court said,

33. See text and note 11, supra.

34. Rumely stated at the hearings that he had registered as a lobbyist "because I send to Congress releases and other material," J.A., p. 32. Rumely admitted that CCG had attempted to influence legislation by circulating letters and telegrams to Members of Congress and private citizens urging defeat of a presidential plan for reorganizing the National Labor Relations Board, Hearings pt. 5, pp. 66–8, H.R.Rep.No.3024, p. 11, protesting executive action under the Walsh-Healey Act [45 U.S.C.A. § 35 et seq.], Hearings pt. 5, pp. 78–9, opposing pending public housing legislation, id. at 79–80, and medical care legislation, id. at 77–8, and supporting tax reforms, id. at 79, including a program for a constitutional limitation on individual income taxes, H.R.Rep.No.3024, pp. 13–14. In addition, the CCG occasionally arranged dinners for congressmen through its Washington representative, including an abortive effort to bring together a group of congressmen at a crucial time in the legislative voting on the Taft-Hartley Act [29 U.S.C.A. § 141 et seq.], Hearings pt. 5, pp. 80–92. Plans for this dinner were made by Homer Dodge, Washington representative of the CCG. Ibid.

Mr. Dodge's other duties apparently included keeping in touch with congressmen on matters of interest to CCG, especially the mailing of CCG propaganda under congressional frank. See various letters by Dodge reproduced at id. pt. 5, pp. 68, 106–7, 151. See also notes 11 and 16, supra.

35. 62 Stat. 719, 724 (1948), as amended, 18 U.S.C. § 612 (1951). 62 Stat. 718, 723 (1948), 18 U.S.C. § 608(b) (1951) reads: "Whoever purchases or buys any goods, commodities, advertising, or articles of any kind or description, the proceeds of which, or any portion thereof, directly or indirectly inures to the benefit of or for any candidate for an elective Federal office including the offices of President of the United States, and Presidential and Vice Presidential electors or any political committee or other political organization engaged in furthering, advancing, or advocating the nomination or election of any candidate for any such office or the success of any national political party, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

36. 43 Stat. 1070, 1071 (1925), 2 U.S.C.A. § 244.

"To say that Congress is without power to pass appropriate legislation to safeguard [the] election [of the President and Vice President] from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self-protection."[37]

No one would seriously contend that the requirements for disclosure under the Corrupt Practices Act are offensive to the Constitution. The First Amendment is not violated merely because disclosure might conceivably deter some from implementing their political views with financial support. And although the question before us does not depend upon the constitutionality of the analogous provisions in the Lobbying Act,"[38] the same principles are applicable to them. If legislation requiring financial disclosure is free from objection on First Amendment grounds, compulsion of these disclosures by legislative inquiry is likewise free from the same objection. The Buchanan Committee has restricted no one in the free exercise of his rights to say what he pleases, or to assemble and to petition for any purpose.

I do not think that the constitutional rights of free speech, press and petition afford a greater degree of protection to contributions in the disguised form of purchases than to contributions in pristine form. And since I believe that the latter are not protected from disclosure by First Amendment rights, I do not see how such protection can be accorded to the former. To hold otherwise would only reward artifice and subterfuge. The CCG's right to promote, retard and otherwise influence legislation is inviolate. But that right does not extend to protection from disclosure of its financial support. I would affirm the conviction.

---

37. Burroughs and Cannon v. United States, 1934, 290 U.S. 534, 545, 54 S.Ct. 287, 78 L.Ed. 484. See also United States v. United States Brewers' Ass'n, D.C.W.D.Pa.1916, 239 F. 163, 169.

38. 60 Stat. 839, 840, 841–2, 2 U.S.C.A. §§ 264, 267.