## DENNIS v. UNITED STATES.
### No. 9597.

United States Court of Appeals
District of Columbia Circuit.

Argued May 7, 1948.

Decided Oct. 12, 1948.

Mr. Louis F. McCabe, of Philadelphia, Pa. and Mr. Earl B. Dickerson, of Chicago, Ill., *pro hac vice*, by special leave of court, with whom Mr. David Rein, of Washington, D.C., was on the brief, for appellant.

Mr. John D. Lane, Asst. U. S. Atty., of Washington, D. C., with whom Messrs. George Morris Fay, U. S. Atty., and John W. Fihelly, Asst. U. S. Atty., both of Washington, D. C., were on the brief, for appellee. Mr. Sidney S. Sachs, Asst. U. S. Atty., of Washington, D. C., also entered an appearance for appellee.

Mr. Frank D. Reeves, of Washington, D. C., filed a brief on behalf of the Committee to Enforce the Fourteenth Amendment as *amicus curiae*, urging reversal.

Mr. Belford V. Lawson, Jr., of Washington, D. C., filed a brief on behalf of the National Lawyers Guild as *amicus curiae*, urging reversal.

Before CLARK, PRETTYMAN and PROCTOR, JJ.

CLARK, J.

Appellant was indicted, tried and convicted under the style (to use the language of the indictment) of "Eugene Dennis, also known as Francis Waldron."

Since the identity of the appellant is well established for the purposes of this action and since his real name is immaterial if the conviction is proper, we shall for the sake of brevity refer to him hereinafter as "Dennis", which is apparently the name under which he desires to travel at the present time whether it be a real name or an alias. So far as the actual facts as to the contempt involved in the indictment and trial are concerned there is substantially no conflict.

The case involves proceedings before the U. S. House of Representatives' Committee on Un-American Activities, operating under House Resolution 5 of the House of Representatives of the United States, 80th Congress, bearing date of January 3, 1947. To avoid repetition, it may be said that this Committee was originally a special committee of the House commonly called the "Dies Committee" which has since by repassage of the House Resolution to the House rules been continued first as a Special Committee, later by the House rules as a standing committee and finally by statute in the same category. It is now commonly known as the "Thomas Committee" following the general practice of reference to Congressional Committees under the name of their chairmen.

Since one of the chief points raised by appellant is a general attack on the constitutionality of the creation of the Committee and of the resolutions, rules and statute authorizing its activities, it may be said at the outset that it is the self-same Committee, operating under the same set of resolutions, rules and statute as has been recently passed on by at least two Courts of Appeals, and in two of the cases by the Supreme Court of the United States in denying petitions for certiorari. See Josephson v. United States, 2 Cir., 1947, 165 F.2d 82, certiorari denied, 1948, 333 U.S. 838, 68 S.Ct. 609, rehearing denied,

1948, 333 U.S. 858, 68 S.Ct. 731; Barsky v. United States, 1948, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied, 68 S.Ct. 1511, 334 U.S. 843; and Eisler v. United States, 1948, 83 U.S.App.D.C. 315, 170 F. 2d 273.

These cases were to the unanimous effect that the constitutionality of the authority of the Committee should be upheld, that the creation of the Committee and the matters confided to it for investigation were constitutional and lawful. This would seem to settle this question but since the appellant had devoted a large part of his brief to this subject, his counsel on oral argument was, at the special instance of Justice Prettyman who had written the majority opinion in the Barsky case, indulged to argue the question again. This he did with eloquence and persuasiveness, fortified by copious quotations from magazine writers, pamphleteers, and even by some general expressions from some of the Fathers of the Republic which did not seem to be in point. Nevertheless, he failed to convince any member of the court that the law as established by the three cases mentioned supra should be overruled.

We therefore feel it unnecessary to discuss this question further except to emphasize this point. Once the rule has been established that the creation of the Committee was within the constitutional powers of the Congress (as has been well established by the three cases noted supra), it is neither the business nor the prerogative of this court or any other court to pass upon either the wisdom of Congress in setting up the Committee, the private or public character of members of the Committee or the propriety of the procedure of the Committee unless it transgress the authority committed to it by the Congress under the Constitution.

Dennis was not originally a witness appearing by virtue of process before the Committee. He learned about the investigation through the public press. Thereupon, in the language of the sworn affidavit of his counsel (Joint App. p. 9), he made "formal demand" upon the Committee for the opportunity to appear on behalf of the Communist Party. To this "demand" the Committee courteously responded that it would be glad to have Dennis appear. To this Dennis responded with a somewhat arrogant demand that he be granted at least two hours for his testimony. To this "demand" the Committee again replied courteously that it would be glad to grant him two hours.

When Dennis actually appeared before the Committee, on March 26, 1947, he proved a recalcitrant witness.

Being asked by the Committee for the usual identification, he refused to answer some of the questions directed merely to the question of showing his identity. He refused to answer questions as to the name under which he was born or as to when and where he was born. At this point a Committee subpoena was directed to be served on Dennis. Thereupon, apparently suddenly smit with the delusion that by some marvelous transition he had been appointed to be the spokesman of all of the American people, Dennis arose and shouted: "In the name of the American people, I hold this Committee in contempt." But then and there Dennis was served with a subpoena commanding his appearance before the Committee on April 9, 1947.

These facts are recited only as the background of the service of the subpoena. Appellant was not indicted or convicted for his conduct in this appearance, although he well might have been upon proper citation. He was indicted and convicted for wilful default in answering a lawful subpoena. It is set out because one of the chief contentions of appellant is that the subpoena was not lawfully served upon him because he had appeared voluntarily and therefore enjoyed some sort of fancied immunity from service.

This contention of appellant that the subpoena was illegally served is without the slightest foundation in reason. It is based upon a misinterpretation of an old case decided in the Supreme Court of the District of Columbia (now United States District Court for the District of Columbia), in 1874, in Wilder v. Welsh, 1 MacArthur 566. This case is cited by appellant as establishing the principle that a witness was immune from the service of a sub-

poena. As a matter of fact, the case holds directly to the contrary. That was a case in which a motion was made to set aside the service of a summons upon the ground that the defendant in a suit, when the service was made upon him, was a witness from one of the States *in attendance upon a congressional committee under a subpoena* and was, therefore exempt from process while in attendance, and in coming and returning from the city. The court held that the privilege of a witness before Congress or any of its committees, stands on the same footing as the privilege of the members of that body, and *that this does not extend to freedom from the service of a simple summons but only to freedom from arrest.* The court overruled the motion on the ground that no privilege had been violated.

To urge that a person who voluntarily appears before a Congressional Committee and is not only in the jurisdiction but the actual presence of the Committee is exempt from subpoena by the Committee itself is preposterous.

On April 9, 1947, appellant failed to appear before the Committee in response to the subpoena. Instead one Lapidus appeared and stated that he (Lapidus) was a secretary of the Communist Party and attorney for Dennis, that Dennis would not appear but had sent a long statement which he (Lapidus) proposed to read into the record. Since Lapidus had not been subpoenaed by the Committee and was not desired as a witness by the Committee he was not permitted to substitute for Dennis nor to read the purported statement of Dennis but was permitted to leave the statement with the Committee which later read the communication but did not include it in its report to the House.

Upon proper citation by the House, Dennis was indicted, tried and convicted for the crime of wilful default in failing to answer the subpoena. In view of the defense which appellant has attempted to set up in this case, it is to be remembered that the case now before this court has nothing to do with the fact that Dennis is a Communist nor does it involve any question of Dennis refusing to answer questions as to his political views or anything else. It has to do solely with the question of whether he wilfully failed to respond to the subpoena of a lawful Committee of Congress.

The so-called "statement" of Dennis was actually sent to each member of the House of Representatives by zealous friends of the appellant. How many members of the House actually read the document we have no means of knowing, and it is immaterial. We say only that we have read it. While it was rejected for inclusion in the report of the Committee to the House and was also rejected by the trial court, it is included in the record as part of appellant's case as Defendant's Exhibit No. 5 (Joint App. p. 395). This should be read in connection with Defendant's Exhibit No. 3, which is a so-called proffer of proof to be incorporated in Defendant's Opening Statement.

One of appellant's chief contentions is that he should have been permitted to have his substitute (Lapidus) read into the record of the hearing of the Committee as a *legal objection* to the validity of the Committee process which would purge him of contempt for his refusal to appear before the very same Committee upon which he had only a few days before been pressing his "formal demands" for the right to appear. "Defendant's Exhibit 5", being the statement which Lapidus sought to read into the record upon behalf of Dennis, is not a statement of legal objections to his appearance before the Committee, and bears none of the characteristics of such a document. It is a long, tedious, irresponsible harangue, for nearly all of its length scurrilous and scandalous, and for the most part completely irrelevant. It does not content itself with a long and most insulting onslaught on the Committee collectively and individually and a denunciation of their character both public and private, but included many others in no way connected with the Committee who had happened to incur the displeasure of the appellant. Thus in this "statement", which is relied upon in this court to show that appellant was only seeking to make a strictly legal objection to his appearance in response to process, the appellant as part of his "legal objections" to not appearing was not content with denouncing the late Theodore Bilbo and the

late Eugene Talmadge but went on to denounce the former Attorney General of the United States, the late A. Mitchell Palmer, and also the present and respected head of the F. B. I. of the United States, J. Edgar Hoover, and others. He concluded this with most sanguinary threats as to the political revenge and punishment which he and his associates proposed to wreak on the personnel of the Committee and any other who sympathized with or supported them in the forthcoming elections.

Of course, this was not a legal objection and was properly rejected by the Committee and by the trial court.

■ The first sentence was as follows: "This is to inform you that I shall not attend the meeting of your committee on April 9, 1947." This was complete and adequate proof that the failure of appellant, Dennis, to respond to the subpoena was his deliberate and considered act.

■ Appellant strenuously insists (p. 38 et seq. Appellant's Brief) that to make out a case of wilfulness under the statute it was necessary that the Government be required to allege and prove that the act of refusal shall have been done from a bad purpose or evil motive. Such is not the law. As far back as American Surety Co. of New York v. Sullivan, 2 Cir., 7 F.2d 605, it was said by Judge Learned Hand at page 606: "The word 'willful,' even in criminal statutes, means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law. Grand Trunk R. Co. v. United States [7 Cir.], 229 Fed. 116, 143 C.C.A. 392 * * *" and citing other cases.

In the well-known case of Townsend v. United States, 95 F.2d 352, at page 358, decided by this court in 1938, this court said: "On the other hand, the general rule in criminal cases is that a mistake of law upon the part of the accused does not constitute justification for his act; that, if he deliberately and intentionally commits the prohibited act, *it is criminal, regardless of his belief that his act was lawful*; except in cases where ignorance of the law may disprove the existence of a required specific intent. * * * This is true even though the motive of the accused may be of the highest, as in the case of one who believes that his act is part of his professed religion."

In the same case at pages 357-358, this court said: "Appellant contends that under the statute here involved the first meaning mentioned by the court, namely, 'done with a bad purpose,' is controlling. The cases cited by the court support that meaning and similar holdings are found in other cases, but, even though it applied that meaning to the peculiar facts of that case, it is clear *that the court did not intend to limit the application* of the word 'willful' in all cases to 'acts done with a bad purpose.' The meaning of the word depends in large measure upon the nature of the criminal act and the facts of the particular case. It is only in very few criminal cases that 'willful' means 'done with a bad purpose.' Generally, it means 'no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.'" (Quoting from and with approval American Surety case supra).

Further at page 358 in the same case, the court said: "Appellant does complain, however, that the court erred in excluding certain evidence * * * sought to be introduced on the theory that it tended to prove justification for his act and hence to disprove willfulness. None of it was admissible on that theory and it was properly rejected by the trial court."

In the very recent case of Fields v. United States, 164 F.2d 97, decided by this court on October 27, 1947, we find the very question raised by appellant in regard to wilfulness.

At page 99, this court said: "The principal issues raised on appeal are whether or not the court below erred in failing to direct a judgment of acquittal as to the second count; whether or not the word 'willfully', as used in the statute, implies an evil or bad purpose; and the related question of whether or not good faith has any bearing on the issue of willfulness. The last two issues arise from the court's charge to the jury that an evil or bad purpose is

immaterial, and the court's refusal to charge that appellant's acts assertedly constituting good faith had a bearing on the issue of willfulness. * * *

"Appellant contends that the word 'willful' has a meaning which includes an evil or bad purpose when used in a criminal statute. We think the term has acquired no such fixed meaning according to the type of statute in which it is employed. The Supreme Court has said, long ago, 'In construing a statute, penal as well as others, we must look to the object in view, and never adopt an interpretation that will defeat its own purpose, if it will admit of any other reasonable construction.' " [1]

This court accordingly affirmed the judgment of the District Court.

Appellant in his brief states (Br. p. 38) that the Fields case was contrary to the views of the Supreme Court. Apparently the Supreme Court did not think so for it denied certiorari in the Fields case on January 12, 1948. 332 U.S. 851, 68 S.Ct. 355.

So far as the question of wilfulness is concerned, the Fields case cannot be distinguished from the instant case. That appellant's action was intentional and deliberate was again made perfectly clear after Dennis had been convicted and before he was sentenced. Justice Pine said: "Mr. Dennis, the primary purpose of interrogating witnesses before Congressional committees is to assist Congress in formulating legislation. This Committee desired your testimony. That has been denied to them by your refusal to appear and testify. Do you have a desire to appear before that Committee now and purge yourself of that contempt? If you do I might take action which I think will be just and proper under the circumstances."

After consulting his counsel, Dennis attempted a long statement justifying his position in an apparent misunderstanding of the court's question. When the question was repeated, Dennis declined and stated that he wished to stand on his statement. (Joint App. pp. 360-362).

The mere fact that appellant claimed in his letter to the Committee to have consulted counsel and that his failure to respond to the subpoena was the result of his own legal opinion based upon consultation with his unnamed counsel is no defense. If it were, many corporations, organizations and even individuals would maintain counsel permanently for the purpose of advising them against doing anything that they do not wish to do. Certainly, the letter of appellant (Def. Ex. 5) was not the statement of any legal objection and could not possibly have been considered as representing any advice of counsel. Nor was the so-called "proffer of proof" (Def. Ex. 3) any offer of any legal evidence whatever. Both were properly excluded by the trial court.

Appellant strongly urged that the court erred in denying appellant's motion to transfer the cause from the District of Columbia, and in overruling his challenge of all talesmen who were employees of the United States Government. There is no merit in either contention. On voir dire, prospective jurors were carefully interrogated by the court and counsel. Two jurors were excused for cause as having formed opinions. As the jury was finally constituted only three had even as much as heard of the case by reading the newspapers and two of them had merely "scanned the headlines." In view of this exhaustive investigation and the repeated assertion of the complete absence of prejudice the contention as to the jury seems pointless.

Jury service is not only a duty of citizenship, it is a right as well. Blanket disqualification for jury service would operate as a bill of attainder on the many hundreds of thousands of federal employees throughout the nation.

In the case of United States v. Wood,[2] the Court upheld the validity of the Act of August 22, 1935, which removed the disqualification of government employees serving on juries in criminal cases in the District of Columbia and held that such statute contravenes neither the Sixth Amendment nor the common law. As said by the Court,

---

[1] The Emily and The Caroline, 1824, 9 Wheat. 381, 388, 6 L.Ed. 116.

[2] 1936, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78.

the Act of August 22, 1935, concerning qualifications for jurors in the District of Columbia leaves all prospective jurors subject to examination and rejection for actual bias. The Court adds that in dealing with an employee of the Government, summoned to jury service in a criminal case, the court should be solicitous to discover whether, in view of the nature or circumstances, or of the relationship of his particular governmental activity to the matters involved in the prosecution he has actual bias. 299 U.S. at page 150, 57 S.Ct. at page 187, 81 L.Ed. 78, the Court says: "To impute bias as a matter of law to the jurors in question here would be no more sensible than to impute bias to all storeowners and householders in cases of larceny or burglary.

"It is suggested that an employee of the government may be apprehensive of the termination of his employment in case he decides in favor of the accused in a criminal case. Unless the suggestion be taken to have reference to some special and exceptional case, it seems to us far-fetched and chimerical. It does not rise to the dignity of an argument to be addressed to the power of Congress to provide a reasonable scheme with respect to the qualifications of jurors. It belongs in the category of 'theoretic or imaginary' interests—'remote' and 'insignificant', as described in the Massachusetts case above cited." See also recent cases in this court: Higgins v. United States, 1946, 81 U.S.App.D.C. 371, 160 F.2d 222; Frazier v. United States, 1947, 163 F.2d 817.

As for the error alleged in the denial of appellant's motion for a change of venue, under the Federal Rules of Criminal Procedure, rule 21(a), 18 U.S.C.A., this motion "is addressed to the sound discretion of the trial court and, in the absence of an abuse of discretion, the denial of the application is not error." Kersten v. U.S., 10 Cir., 1947, 161 F.2d 337, 339, certiorari denied, 331 U.S. 851, 67 S.Ct 1744, 91 L.Ed. 1859.

We pass now to the point on which appellant's counsel have expended most of their energies and in which in our view their contentions closely approach the fantastic. They contend that the conduct and processes of the Committee are all invalid because the Committee is not in fact a committee of the House of Representatives in that it was not composed exclusively of members of Congress but included Congressman John E. Rankin of Mississippi, who, according to appellant, is not a member of Congress at all, although it is conceded that he had duly presented his credentials from Mississippi as one of the congressmen duly elected to represent Mississippi under the provisions of the Apportionment Act of 1941, 2 U.S.C.A. §§ 2a, 2b, and had been sworn and seated by the House of Representatives.

But according to the theory of appellant the election laws and practice of Mississippi do not conform to appellant's views of the requirements of the 14th Amendment to the Constitution of the United States. Therefore, appellant has set up an intricate system of calculation of his own from which he has arrived at the conclusion satisfactory to himself that Mississippi should have been allotted no more than four representatives instead of the seven which they were actually allotted under the Apportionment Act of 1941. From this appellant deduces that *all* of the congressmen from Mississippi are mere interlopers and that none of them is a Member of Congress and that any legislative acts with which they were connected are invalid. It would follow from that that the same rule would apply to invalidate any precedent or subsequent acts of Congress in which Members of Congress from any other state to the election laws and practices of which appellant happened to take exception participated. It would invalidate among other legislation the "G. I. Bill of Rights" bill which was reported by a House Committee of which John E. Rankin was Chairman, and of which he was in charge on the floor, as well as much other important veterans' legislation in the same category. To go a little further back it would have invalidated the Underwood Tariff Act, the Humphrey's Flood Control Act, the Pujo Money Trust Investigation and much other important legislation. Indeed, followed to its logical conclusion it would invalidate all legislation participated in or voted upon by members of Congress

from any state of whose election laws appellant disapproves.

■ We have not before us the question of the election laws of Mississippi and we express no opinion as to them or the election laws of any other state. We say only that the contentions of appellant in this regard are sheer nonsense. The validity of the Apportionment Act of 1941 cannot be attacked in a collateral proceeding. ·

Justice Keech very properly quoted Watson on Constitutional Law (Vol. I, p. 1653) wherein it is said: "Congress has never exercised the power conferred upon it by this section [14th Amend.] of reducing the representation of a State in the House of Representatives but there can be no question of its power or its right to do so. Of its duty to do so, it alone is the judge. The amendment places the responsibility of enforcing its provisions upon that body."

■ And to the same effect see Willoughby on the Constitution, Vol. II, 2d Ed., pp. 626, 627. The trial court then properly held as a matter of law that it is not its function to pass upon the issue presented by the motion to take testimony in aid of the motion to dismiss and properly dismissed the motion.

The question is clearly political rather than judicial. In the recent very illuminating case of Saunders v. Wilkins, 4 Cir. 1945, 152 F.2d 235, certiorari denied, 328 U.S. 870, 66 S.Ct. 1362, 90 L.Ed. 1640, which was a case on almost identical issues, Judge Soper, speaking for the court said among other things 152 F.2d at page 237: "It is the contention of the appellant, however, that even if the Virginia poll tax law does not offend the first section of the Fourteenth Amendment [which earlier in the opinion the court had decided it did not], nevertheless the statute falls within the terms of the second section of the Amendment by abridging the right of citizens of the United States to vote, and therefore the Apportionment Act of Congress of 1941 and the Redistricting Act of the State Legislature, which failed to take into account the effect of the poll tax act, are invalid with the consequences outlined above. We think that this contention presents a question political in its nature which must be determined by the legislative branch of the government and is not justiciable." And again 152 F.2d at page 238, the court said: "It is equally true that the court is without power to *reduce the number of Representatives fixed by Act of Congress or to decide in case the number of Representatives from Virginia should be reduced, what disposition should be made of the vacancies thus caused, or to what states they should be allotted in order to maintain the total ordained by Congress. * * ** It is true that the pending case takes the form of a suit for damages against the Secretary of State [of Virginia] for failure to certify the candidacy of the appellant, but in order to fix liability upon the Secretary, it would be necessary for this court to hold that notwithstanding the Act of Congress, the number of Representatives from Virginia and therefore of other states in the Union as set out in the Act of Congress is erroneous and should be changed. This determination we have no power to make."

The reasoning of the Saunders case applies with greater strength to the case at bar where the 1941 Apportionment Act is only attacked collaterally as an unsound defense in a criminal case. The judgment of the trial court is therefore

Affirmed. ·