**UNITED STATES v. TRUMBLAY.**

No. 10905.

United States Court of Appeals Seventh Circuit.

Dec. 2, 1953.

---

148

Harry S. Taylor, South Bend, Ind., for appellant.

Joseph H. Lesh, U. S. Atty., Ft. Wayne, Ind., James E. Keating, Asst. U. S. Atty., South Bend, Ind., Phil Mc-Nagny, Jr., Asst. U. S. Atty., Fort Wayne, Ind., for appellee.

Before MAJOR, Chief Judge, DUFFY, Circuit Judge, and PLATT, District Judge.

MAJOR, Chief Judge.

Defendant was charged in a two-count indictment with the offense of robbing the National Bank and Trust Company of South Bend, Indiana, an insured bank of the Federal Deposit Insurance Corporation. The first count was predicated upon Title 18 U.S.C.A. Sec. 2113(a), and the second, which alleged an assault with a dangerous weapon in connection with the robbery, upon Sec. 2113(d) of the same Title. The offense charged in both counts was alleged to have been committed on September 19, 1952. The defendant, in a trial by jury, was convicted as charged. A motion for a new trial on the ground that the verdict was

not supported by substantial evidence was denied. From a judgment entered upon such verdict, the appeal comes to this court.

Four grounds for reversal are urged: (1) that the District Court erred in overruling defendant's motion for a change of venue; (2) that the evidence was not sufficient to support the verdict; (3) that the court erred in admitting acts and declarations of an alleged co-conspirator, and (4) that the court erred in the giving of clarifying instructions at the jury's request, during their deliberation.

■ The contention that the court erred in its refusal to allow defendant's motion for a change of venue is without merit. Nothing was submitted by the defendant in support of such motion other than a single affidavit made by defendant's father, which asserted that the defendant could not obtain a fair trial because of the prejudice of the inhabitants of the jurisdiction in which the case was pending. The affiant, however, resided in the City of Chicago, and the assertions contained in his affidavit were entitled to little, if any, weight. On the other hand, the government submitted affidavits by persons in a position to be informed, that they were without knowledge of the character of prejudice asserted by defendant.

Rule 21(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., provides for the transfer of a case on motion of the defendant "if the court is satisfied that there exists in the district or division where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that district or division." It has been held, as defendant in his brief recognizes, that a question as to change of venue is discretionary and that in the absence of an abuse of discretion, denial of an application is not error. Rakes v. United States, 4 Cir., 169 F.2d 739; Dennis v. United States, 84 U.S.App.D.C. 31, 171 F.2d 986. Moreover, the court in its *voir dire* examination of jurors made

inquiry if any of them entertained any prejudice because of newspaper articles or what they had heard about the case. No objection was interposed by defendant's counsel as to the manner in which the court conducted this examination and there was no suggestion or request that counsel be permitted to make further inquiry. It may also be noted that defendant did not exhaust the peremptory challenges to which he was by law entitled.

■ We have examined the testimony with care and are satisfied, even though it was circumstantial, that it was sufficient to justify submission of the case to the jury and, consequently, sustains the verdict. It was conclusively shown that at about 11 a. m. on September 19, 1952, three armed and masked persons entered the bank named in the indictment and that one of the three employees, at that time in the bank, was shot in the arm with a shotgun. In a matter of seconds, some $52,000, in denominations ranging from $1 to $100, but mostly in $10 and $20 bills, was taken from the bank. The three masked bandits left the bank and entered a green Oldsmobile with Illinois license 1515–180, parked at the side of the bank building, with a driver who had a gun in his hand, and in which the four persons rapidly drove away. The Illinois license plate had shortly before the robbery been stolen in Chicago while the owner's car was parked in front of his residence. The green Oldsmobile in which the robber made their escape had been stolen from a Gary, Indiana, parking lot about 4 p.m. on September 17 (two days prior to the robbery), and at that time bore an Indiana license plate No. CD–1425. A finger print examiner of the F. B. I., with twenty-eight years' experience in examining fingerprints, testified that prints found upon the rear-view mirror of the Oldsmobile car in which the robbers escaped were those of the defendant. About a week after the robbery, defendant's father, Walter Trumblay, purchased from a Chicago automobile dealer a 1952 Oldsmobile–88, for the amount of

$2,921.00. Payment was made in cash, consisting of two $100 bills and the remainder in different denominations, mostly $10 and $20 bills. The money was paid to the dealer by the father and title taken in his name. The defendant accompanied his father to the place of business of the automobile dealer but remained outside the building, where he was joined by his father after the purchase. This was the car defendant was driving at the time of his arrest, under circumstances subsequently related. Sometime after defendant's arrest and while he was confined in the Lake County jail, he was visited by his father and the two men engaged in a conversation. A special agent in a secreted position could hear what was said by defendant but not by his father. He heard the defendant state to his father, "You'd better be careful or I will have you in here," "Why, by fingering you, that is how," and "You remember the day we talked about casing the bank. This F. B. I. pigeon told the G men about that."

No question is raised but that proof of the circumstances so far related was properly received. In the absence of any explanation, we think they were sufficient to connect the defendant with the bank robbery either as a principal, accomplice or accessory.

Many other circumstances were shown, some of which are relied upon by the government as showing that a person by the name of Bowerman was connected with the defendant in the robbing of the bank and that they were engaged in a conspiracy or joint enterprise. It is upon this basis that the government seeks to justify proof relative to certain statements made by Bowerman, and particularly evidence as to his activities. Defendant contends that no showing was made which would authorize the admission of such testimony on the theory claimed by the government. We shall not attempt to specify what proof is necessary to show a conspiracy, concerted action or joint enterprise. Any effort in that respect would prove as fruitless as a description which we might attempt to make of the processes of the atomic bomb. The decisions generally stand for the proposition that whether such a relationship exists is a matter for the District Court and that a jury's affirmative conclusion is not to be disturbed even though the proof may be meager. While we do not regard the proof as strong that there existed between defendant and Bowerman the relationship which the government asserts, yet we cannot say that the circumstances shown were not sufficient to justify the jury in accepting the government's theory. There is proof that these two parties were closely associated and often seen together both prior and subsequent to the robbery, under circumstances which strongly indicate that they both were connected with the crime in one form or another.

A ravine located a short distance off Ardmore Road west of South Bend is a place much mentioned in the testimony. Both the defendant and his father, as well as Bowerman, had on several occasions previous to the robbery inspected the premises on which this ravine was located, and all had attempted to purchase it. Bowerman at one time prior to the robbery had lived near the ravine. On the evening before the robbery, a green automobile was seen in this ravine, hidden largely from view by brush and weeds. On the next morning (that of the robbery) it was not there. About 6:30 p.m. on the evening of the robbery, F. B. I. agents went to this ravine and located a 1952 green Oldsmobile sedan. It bore a 1952 Illinois license plate No. 1515–180. This car met the description of the car in which the robbers made their escape from the bank, bore the same Illinois license number and was identified as the car which had been stolen from a Gary parking lot two days previously. It was at this time the F. B. I. agent removed the rear-view mirror on which were fingerprints later identified as those of defendant, as previously stated. There were also found in this ravine papers containing Bowerman's name and license plate No. CD–1425, which was on the Oldsmobile car at the time it was stolen in Gary. A few

days later the F. B. I. agents also discovered hidden in a galvanized tile a small arsenal, consisting of rifles, shotguns, pistols and ammunition wrapped in plastic raincoats, which had been stolen from a hardware store shortly previous to the bank robbery. The F. B. I. agents kept the ravine under surveillance and, on the afternoon of September 30, two automobiles were discerned driving around in the immediate neighborhood of the ravine. One of these, a black Ford, was driven by Bowerman and the other, an Oldsmobile sedan with no license plate, was driven by defendant. (This was the car purchased in Chicago allegedly by defendant's father four days previously.) The two automobiles left the immediate scene but shortly returned, the Oldsmobile following the Ford. At one time the Oldsmobile was parked and both defendant and Bowerman were riding in the Ford. Finally, the Oldsmobile car was stopped by the officers and the defendant arrested. Bowerman, in the Ford, made his escape. Defendant's explanation for being in that neighborhood, as given to the officers at the time of his arrest, was that he was looking around at property with the view of purchasing a home. He denied that he knew Fred Bowerman, although the officers had seen the two men in the Ford car only a few minutes previously.

Later the officers went to the room which had been occupied by Bowerman and were admitted by the landlady. There they found ads of Halloween masks and a guide map of South Bend and surrounding territory, marked with the streets and intersections constituting a route extending from the bank which was robbed to the ravine. Bowerman was not there, had quit his job on the day of defendant's arrest and the record reveals nothing further concerning him.

■ This route map was admitted in evidence over the objection of the defendant on the ground that he was not shown to have been connected with it. The officer, however, who had found and identified the map had been permitted, without objection, to testify in much detail as

to what the map disclosed, and particularly with reference to the marked route which led from the bank to the ravine. After that had been done, it is not discernible how the introduction of the map was an aid to the government or harm to the defendant. If this line of testimony had been admitted over objection seasonably made, a question of its propriety would be presented. ·We are of the view, however, that its admission was a matter of little consequence in view of the entire record and, in any event, that its admission cannot reasonably be characterized as prejudicial error.

■ Another line of testimony now asserted to have been improperly admitted relates to the so-called impeachment of defendant's father, Walter Trumblay, who was placed upon the witness stand by the government and inquiry made of him as to certain statements which he made to F. B. I. officials, mostly in reference to the circumstances under which the Oldsmobile car was purchased after the bank robbery. He either denied or failed to remember the making of certain statements called to his attention. Two F. B. I. agents followed him to the stand and were permitted to testify in considerable detail as to the statements which he made to them. Defendant's main complaint appears to be that the agents were permitted to testify generally as to what Trumblay had told them rather than being required to answer certain specific questions which had been asked of the witness sought to be impeached. In other words, the complaint goes to the manner employed in impeaching the witness and not to the right of the government to do so. We think there is merit to the criticism; certainly the manner of the impeachment, to say the least, was unorthodox. Again, however, this testimony was admitted without any objection on the part of the defendant and we do not think it was of such a prejudicial nature as to affect the result on this appeal.

■ During the course of the jury's deliberations, the court recalled the jury

to the courtrom and, at the jury's specific request, gave what is characterized as clarifying instructions. This consisted only of reading to the jury the sections of the statute upon which the indictment was predicated and the section defining an aider and abettor. Thereupon, the court inquired of both counsel for the government and the defendant, "Do you have any requests or objections?" to which the government attorney responded, "No," and defendant's attorney responded, "I have nothing else." Defendant contends that it was error to thus read these statutory provisions to the jury without informing the jury as to other principles governing the case or that such statutory provisions must be considered together with the instructions previously given. We think there is no merit in this contention, particularly in view of the fact that the procedure was assented to by defendant's counsel.

As stated, we think the evidence is sufficient to support the jury's verdict and the judgment rendered thereon, and that the record shows no error which requires a reversal. The judgment is

Affirmed.