**D. H. ROE and Stratoray Oil, Inc.,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 18162.**

United States Court of Appeals
Fifth Circuit.

Feb. 17, 1961.

Rehearing Denied May 23, 1961.

Wm. C. Pannell, Leo Brewster, Fort Worth, Tex., for appellants.

W. B. West, III, U. S. Atty., Robert S. Travis, Asst. U. S. Atty., Fort Worth, Tex., for appellee.

Before CAMERON and BROWN, Circuit Judges, and HANNAY, District Judge.

JOHN R. BROWN, Circuit Judge.

As this case percolates to us, it is but a bare shadow of its former self in the trial court. There it was a multi-party, multi-count indictment against Roe individually, the corporation, Stratoray Oil Company, Inc. of which Roe was President, and another, an advertising writer. At the heart of this case as the jury heard the evidence for many, many days was a high-pitched, hard-sell extravagant solicitation campaign to sell through the mail to thousands of persons over the United States oil leases on small tracts in Texas and Utah. Counts 1 through 7 charged each with violation of the Securities Act of 1933, Title 15 U.S.C.A. § 77q (a) (1), by the use of the mails to defraud in the sale of securities. Counts 8 through 14 charged each with mail fraud under 18 U.S.C.A. § 1341 in connection with the sale of the same interests. Counts 15, 16, 17, 18 and 19, which alone remain, charged illegal sale and delivery of securities through the use of the mails without a prior registration with the SEC as required by 15 U.S.C.A. § 77e(a) (1) and (2). Count 20 charged a conspiracy under 18 U.S.C.A. § 371 to violate all of the laws forming the basis of Counts 1 through 19. The advertising writer was acquitted on all counts. Roe, individually, was acquitted on all fraud counts (1 through 14 and 20). The Court entered a like judgment of acquittal as to Stratoray, the corporation. But Roe and Stratoray were each found guilty under Counts 15 through 19. This means that as we review these convictions, we are not, at this stage, permitted to read into any of the transactions any moral overtones of fraud. We must regard them in the posture of nonfraudulent violations of the registration requirements of the Securities Act. What the jury washed out thus has immediate relevance in our approach. It also highlights the prejudicial effect of the error we find in the Court's charge.

For reasons we later point out, we conclude that the case must be reversed and remanded for error in the Court's charge. But since the case ought not to be retried if these facts, if credited by a jury, do

not constitute a federal crime, we think it essential that we first discuss the basic contention of the appellants. In a nutshell it is simply this. The sale of the entire (⅞ths) mineral lease in a specific piece of property does not constitute the sale of a "security" under the Act. Consequently, since the registration statement is required only as to "a security," there was no violation of this Act.

On the surface there is a good deal to this position. The mailed advertising solicitation material, extravagantly optimistic as it was, offered to the prospects mineral leases only. In the numerous sales effected through this means, that is all that was sold and delivered. There was not, therefore, any sale, offer of sale, or delivery of a "fractional undivided interest in oil, gas, or other mineral rights" as the definitive section of the Act sets forth. Nor did such oil leases fit within any other specifically itemized interests.[1] If they are to come within the term "security" they must do so as an "investment contract."

At this late date we do not think that there can be any real doubt that offerings of oil leases in this fashion may amount to an "investment contract." This was the heading specifically recognized for such transactions by S. E. C. v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, as it reversed this Court's holding that these were sales, not of a security, but an interest in property, real or personal. Because it would be out of keeping with the remedial object of this legislation reflecting a long current of like enactments in the various states, that case also rejected any construction of the Act on the basis of handy Latin aphorisms that would exclude from coverage mineral interests other than those specifically enumerated as "fractional undivided interest in oil, gas, or other mineral rights." 320 U.S. at page 350, 64 S.Ct. at page 123.

Of course it takes something more than a mere "offering [of] naked leasehold rights," 320 U.S. at page 348, 64 S.Ct. at page 122, or, in a different situation, the mere fee ownership of a piece of land, Blackwell v. Bentsen, 5 Cir., 1953, 203 F.2d 690, certiorari dismissed 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078. Regarded as relevant and sufficient by Joiner were these factors. The "economic inducements of the proposed and promised exploration well"; submitting a proposition to prospects to sell them "documents which offered the purchaser a chance, without undue delay or additional cost, of sharing in discovery values which might follow a current exploration enterprise"; the "exploration enterprise was woven into [the] leaseholds, in both an economic and a legal sense." 320 U.S. at page 348, 64 S.Ct. at page 122. Irrelevant, on the other hand, and at least not decisive are other factors such as the nature, real or personal, of the property formally conveyed, or the fact that to appraise its character examination of facts beyond the face of the instrument may be required. For Joiner likewise stated, "The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." 320 U.S. at pages 352–353, 64 S.Ct. at page 124. While it is nec-

---

1. "When used in this subchapter, unless the context otherwise requires—

"(1) the term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certficate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U.S.C.A. § 77b as amended June 1934.

essary in any case under the Act to prove "that documents being sold were securities under the Act" which sometimes "might be done by proving the document itself," in "others proof must go outside the instruments itself as we do here." 320 U.S. at page 355, 64 S.Ct. at page 125.

■ All of this was spelled out with more positiveness in S. E. C. v. W. J. Howey Co., 1946, 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244. "Form", that case announces, is to be "disregarded for substance and emphasis" is to be "placed upon economic realities." Following the pattern of state legislation so well known to Congress, the Court declared that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." 328 U.S. at pages 298–299, 66 S.Ct. at page 1103. Expressed somewhat differently, the "test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at page 301, 66 S.Ct. at page 1104.

Certainly the facts of this record more than satisfy the Joiner-Howey standard. These sales pitches were more than mere extravagance of the wildest optimism.[2]

Each of them was based upon the economic significance of an existing or proposed test well. It was, so the offering letters stated, these test wells in Utah and in Texas which would suddenly—indeed overnight—give to these small-patch leases sold for as little as $10 an acre a value in excess of $1,000 per acre. Wealth, the blurbs continued, would come to these retired school teachers, cobblers, nurserymen, and others, from the stampede of oil men rushing into the area in a mad scramble to buy leases once the test wells were brought in. This wealth, so it was spelled out in terms which the gullible, young and old, could understand, would come from sales of the leases at these fabulously increased prices together with overriding royalties in future production reserved in such transfers.

In summarizing the hundreds of pages of these exuberant solicitation letters in this fashion, we do not mean to slip obliquely into moral judgments which, at the outset, we emphasized were no longer in the case. We may, as did the Supreme Court in Joiner,[3] credit all of these as being made in the best of faith and, indeed, with a substantial factual basis. The significance of them is not in their extravagance nor even their possibly misleading nature. They are significant because, taken at face value, they offer to the prospective purchaser a chance to reap great rewards—indeed get rich quick—not out of the operation of these leases by the purchasers, but solely because of activities of persons other than the purchasers.[4]

2. Between March 10, 1956, and April 17, 1957, over 54,504 copies of various sales pitch letters were mailed for Stratoray under Roe's signature by a letter-mailing service. The mailing lists were maintained by the letter-mailing service or by Roe or his associates, some of them running to as high as 10,000 names. The lists were the names and addresses of persons unknown to the user. Each list had its own peculiar designation, such as "the Louie White List," the "New York List," the "Utah List," the "Crader List," the "New List," the "Nevada List." The "Buyers List" and the "Hot List" apparently included those who had

already purchased at least one list. These prospects were importuned by telegrams as well. The promotional campaign was highly successful as income from the sale of leases to the small parcels ran about $233,000 during 1956 alone. By about November 1956, Roe and Stratoray had "roughly 1,000 investors".

3. See footnote 4, 320 U.S. at page 347, 64 S.Ct. at page 122.

4. Except that the letters transmitting executed formal assignments of leases to those actually making purchases called attention to the nominal delay rentals.

■ ■ The economic inducement, the allure of this stream of liquid gold, as one letter described it, was the spectacular increase in values of the leases without anything but a patient gullibility upon the part of beguiled purchasers. The promoters were selling a chance to make a great deal of money from activities which were then, or would shortly be, carried on by persons other than the purchasers. In that setting it mattered not whether the test wells were to be drilled by the sellers, or by third persons either under, or independent of, their control.[5] What the purchasers were told was that after they acquired these pieces of property (leases), the activity and energies and expenditures of others—the backers of the test wells—would produce

earnings on the investment. That is enough. Price v. United States, 5 Cir., 1953, 200 F.2d 652, 654. All of this is reviewed extensively in the opinion of Chief Judge Murrah for the 10th Circuit in Woodward v. Wright, 1959, 266 F.2d 108, 112.

In addition, considering that Roe was the president and dominating character of Stratoray through whom Stratoray alone acted for much of the period involved, this record warrants a holding that each had, directly or indirectly, made substantial contributions toward the test wells. In the Texas area it was a contribution of a section of leases to the driller of the well. In Utah it was a substantial payment of cash through the instrument of another corporation dominat-

---

due year after year which would be payable by the purchasers, none of the sales material ever intimated that the purchasers' wealth was to come from his development of his own lease. On the contrary, with the immoderation characteristic of these ghost-written sales letters, the emphasis by Roe and Stratoray was on how much money had to be spent and how much valuable, large, heavy equipment had to be furnished by those drilling, or about to drill, the exploratory test wells. A reasonably prudent-imprudent, prospective purchaser was certainly entitled to infer that the promised bonanza would come to him without any like expenditure on his part. Indeed, the idea of a cobbler from North Carolina going to Utah to develop his 40-acre lease as a means of reaping his reward is so preposterous that not even the sales letters came close to implying that.

5. In Howey the element of expectation of "profits solely from the efforts of the promoter or a third party," 328 U.S. at page 299, 66 S.Ct. at page 1103, which are "to come solely from the efforts of others," 328 U.S. at page 301, 66 S.Ct. at page 1104, as well as that case's restatement of the Joiner holding in the broadest of terms, certainly overcomes any imputation that language in Joiner that the "drilling of this well was not an unconnected or uncontrolled phenomenon" etc. meant to require that the collateral activity be that of the seller or one under his control. Loss, Securities Regulation, 1955 supp. p. 149, as much as says so. "Mr. Justice Jackson's statement that 'The exploration enterprise

was woven into these leaseholds, in both an economic and a legal sense," would seem to apply equally in principle whether the exploration is being done under the seller's control or by a third person." Discussing this same problem, Bloomenthal, SEC Aspects of Oil and Gas Financing, 7 Wyo.L.J. 49, 55 (1953), points out that "from the standpoint of the investor it makes little difference whether the promoter points to a well being drilled by him or whether he points to a well being drilled by someone else. In both instances the purchaser of oil and gas leases in order to make an informed investment must have available pertinent geological information." Written in 1953 this author could not have read the Roe letters created in 1956. But without our suggesting that Roe's action was taken articulately in the light of Joiner, what the author describes is almost a paraphrase of this record. "There are unfortunately at the present time a number of promoters who, aware of the implications of the Joiner case, are offering oil and gas leases on small specifically described tracts and in connection with such sales point to wells being drilled or to be drilled by someone else in the area. As a rule very flamboyant literature featuring vague and general statements and predictions of future developments carefully drawn so as to make criminal prosecution under the mail fraud statute difficult if not impossible, is used in connection with such offerings. * * *." See also Meer, Oil Finance and The Securities Laws, 29 Texas L.Rev. 885, 888 (1951).

ed and later wholly owned by Roe. More than that, the sales letters openly boasted that the locations of the test wells had been fixed by Roe through the use of his "gamma ray scintillator unit." That was, so he boasted, followed by continued supervision and "sitting on" the wells either in person or through geologists selected by him. And, for good measure, the lure of profits through the scintillator was dramatized by the promise that if the particular leases then offered were purchased, those purchasers would be entitled later on to participate in "pyramid priority rights" to purchase "a series of leases selected by [Roe] on the basis of electronic scintillation unit gamma radiation anomaly findings * * *." [6]

Thus we determine that, as a matter of law, the evidence of these transactions, if credited, would constitute the sale or delivery of an "investment contract," hence a "security" thereby requiring registration with the SEC. But the if in "if credited" is a big one. By its very nature, it is the peculiar facts of the setting which turns the offer from a mere sale of property into a sale of a security. That means that the trier of fact, here a jury, must determine the issue. More than that, this being a criminal case in contrast to the more common injunction proceeding or damage suit un-

der the Act, two principles inescapably apply. First, in Mr. Justice Jackson's words "in a civil action * * * a preponderance of the evidence will establish the case; * * * in a criminal case, [the evidence must] meet the stricter requirement of satisfying the jury beyond a reasonable doubt." 320 U.S. 344, 355, 64 S.Ct. 120, 125. Second, and here more decisive, no fact, not even an undisputed fact, may be determined by the Judge. The plea of not guilty puts all in issue, even the most patent truths. In our federal system, the Trial Court may never instruct a verdict either in whole or in part.[7] United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 408, 67 S.Ct. 775, 91 L.Ed. 973; Christoffel v. United States, 1949, 338 U.S. 84, 89, 69 S.Ct. 1447, 93 L.Ed. 1826; Brooks v. United States, 5 Cir., 1957, 240 F.2d 905; Hamilton v. United States, 5 Cir., 1955, 221 F.2d 611, 615; Schwachter v. United States, 6 Cir., 1956, 237 F.2d 640, 644; United States v. Gollin, 3 Cir., 1947, 166 F.2d 123, 126, certiorari denied 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151.

And yet, that is substantially what the Trial Judge did here on the crucial issue of whether these were investment contracts. He instructed them flatly and without equivocation that they were.[8]

---

6. To cap it all the testimony reflected that in their day-to-day operation, Roe and Stratoray and their associates in this intense campaign of mail solicitation referred to the prospects as their "investors." This brings sharply back to mind Mr. Justice Jackson's apothegm that "In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." 320 U.S. 344, at page 353, 64 S.Ct. 120, at page 124.

7. See, Directed Verdicts for the Prosecution in Criminal Cases, 7 Wyo.L.J. 37 (1952).

8. As constructed, Instruction No. 3, 4 and 5 related to the Counts under the Securities Act (Counts 1–7 for fraud, 15 U.S. C.A. § 77q(a) (1); Counts 15–19 under 15 U.S.C.A. § 77e(a) (1) and (2)). The definition of a "security" applicable to all such counts was stated in Instruction

3 but was applicable to Instruction 4 and 5 covering the nonregistration counts (15–19) as follows:

"A 'security' is defined in the Federal Securities Act, 15 U.S.C. 77(b) (1) to include among other things an investment contract.

"You are instructed that assignments of oil and gas leases coupled with collateral agreements, promises and undertakings that wells would be and were being drilled in the vicinity of tracts of land on which such oil and gas lease assignments are offered for sale to test and prove the oil and gas productivity of the area surrounding said wells to be drilled, including the tracts of land covered by said lease assignments offered for sale are investment contracts and are, therefore, a security within the meaning of the law.

"Since it is clear that the investment contracts described in the first count of

This was no mere permissible expression of his opinion on what the evidence showed.[9] For he translated this into positive action that if *"the* investment contracts" were "offered for sale" by defendants "these defendants did engage in the sale of securities within the meaning of the Federal Securities Law." Neither as to the fraud counts covered by Instruction 3 nor as to the non-registration counts (covered by Instruction 4 and 5) did the Court ever submit the question whether these were investment contracts within the legal definition stated by the Court. As to the counts on which the jury returned a verdict of guilty (15–19), all that was submitted was whether the defendants (1) used the mails to sell or deliver and (2) whether a securities registration was in effect. The subject of the sale or registration impliedly incorporated within these two issues was, of course, "securities namely, investment contracts." But as to this the Court had already given precise directions in unmistakable terms.

 On such a crucial matter, particularly in a long dramatic trial, the greater part of which was preoccupied with phases involving claimed misrepresentation and active fraud growing out of these flamboyant high pressure sales letters—and on which the jury was not moved to convict—it was essential that full and plain instructions be given. In clear and understandable language the Judge should have told the jury that to convict it must first find that, within the definition of an investment contract given by the Court, these transactions were an investment contract. Only then, did sale through the mail without registration become a federal crime.

Constructed as this charge was, the Court's instruction, note 8, supra, was not, as suggested by the Government, a mere declaration that the indictment was sufficient. That was a matter of no concern to the jury, and the lawyers from the long agony of the trial were already conscious that that was so. The Court had passed the point in his charge of describing the indictments and was here translating instructions into definitive action by the jury depending upon its resolution of the facts.

 In the face of objections stated with precision and clarity complaining of the charge as a partial direction of a verdict of guilty and a failure to submit to the jury a crucial issue, the Court was obliged to take corrective steps so that the jury would clearly understand that it had three, not two, issues for decision. The failure to do this was a substantial and harmful error.

The appellant also asserts that the Court erred in not giving an appropriate instruction on "willfully" as it is used in the Act.[10] They contend that "willfully" as used connotes a consciousness that the law was being violated, i. e., done with an evil purpose. They assert that this is required under such cases as United States v. Kemble, 3 Cir., 1952, 197 F.2d 316; Hargrove v. United States, 5 Cir., 1933, 67 F.2d 820, 90 A.L.R. 1276; Bloch v. United States, 9 Cir., 1955, 221 F.2d 786. To these might well be added: St. Johns-

this indictment come within the definition of the term 'security' as set forth in the Federal Securities Act, I instruct you that if you find and believe from the evidence beyond a reasonable doubt that the investment contracts were offered for sale or sold by these defendants that these defendants did engage in the sale of securities within the meaning of the Federal Securities Law."

9. The charge did not contain an instruction in the traditional language making it clear that expressions of opinion by the Judge on the evidence were in no way binding upon the jury as the sole trier

of the facts. This is asserted as an independent ground of error as is the failure to give an instruction about the possible self-interest of Government witnesses. We need not pass on these complaints as such.

10. "Any person who *willfully* violates any of the provisions of this subchapter, or the rules and regulations promulgated by the Commission under authority thereof * * * shall upon conviction be fined not more than $5,000 or imprisoned not more than 5 years, or both." Emphasis added. 15 U.S.C.A. § 77x.

bury Trucking Co. v. United States, 1 Cir., 1955, 220 F.2d 393; Boyce Motor Lines, Inc. v. United States, 1952, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367; Automatic Canteen Co. of America v. F.T. C., 1953, 346 U.S. 61, 73 S.Ct. 1017, 97 L. Ed. 1454. The Government, on the other hand, insists that this is but another instance of a public welfare *malum prohibitum* statute requiring only that the actor intentionally, i. e., not accidentally, negligently, etc., do the act which the statute condemns, the law thereafter imputing the "willful" intention to do all that which is the natural consequence of such an act. The Government rests on the principles expressed in some leading cases [11] and cites a number of others applying such principles to regulatory statutory schemes analogous to the Securities Act.[12] And it points to two cases under the Securities Act so holding [13] and others implying as much.[14]

■ We agree, however, with the Government that this point was not adequately reserved by appropriate objections, and the circumstances do not call for our taking notice of it as plain error. We think resolution of that problem under this Act—nearly always a difficult decision—should await a proper presentation.

The remaining exceptions to the charge are without any validity.[15] The other complaints we regard either as inconsequential or not likely to recur.

Reversed and remanded.

11. United States v. Dotterweich, 1943, 320 U.S. 277, 280, 64 S.Ct. 134, 88 L.Ed. 48; United States v. Balint, 1922, 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604; United States v. Behrman, 1922, 258 U.S. 280, 288, 42 S.Ct. 303, 66 L.Ed. 619; cf. Lambert v. People of State of California, 1957, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228. Of course this whole complex field is discussed at length in Morissette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, and many of the cases from this Court are catalogued in United States v. DeWitt, 5 Cir., 1959, 265 F.2d 393, 402–404 (dissenting opinion).

12. Fraud and False Statements (18 U.S. C.A. §§ 1001–1026): McBride v. United States, 5 Cir., 1955, 225 F.2d 249, 253–255, certiorari denied 350 U.S. 934, 76 S.Ct. 306, 100 L.Ed. 816; McClanahan v. United States, 5 Cir., 1956, 230 F.2d 919, 924, certiorari denied 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47.

Interstate transportation of firearms (15 U.S.C.A. § 902): Braswell v. United States, 10 Cir., 1955, 224 F.2d 706, 709, certiorari denied 350 U.S. 845, 76 S.Ct. 86, 100 L.Ed. 752.

Fair Labor Standards Act (29 U.S.C.A. §§ 201–219): Nabob Oil Company v. United States, 10 Cir., 1951, 190 F.2d 478, 480, certiorari denied 342 U.S. 876, 72 S.Ct. 167, 96 L.Ed. 658.

Interstate Commerce Act (49 U.S.C.A. §§ 1–27): United States v. Gunn, D.C. W.D.Ark.1950, 97 F.Supp. 476, 480; Inland Freight Lines v. United States, 10 Cir., 1951, 191 F.2d 313, 316; United States v. E. Brooke Matlack, Inc., D.C. Md.1957, 149 F.Supp. 814, 819.

Emergency Price Control Act of 1942 (50 U.S.C.A.Appendix, §§ 901–946): Zimberg v. United States, 1 Cir., 1944, 142 F.2d 132, 137, 138, certiorari denied 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573; Watts v. United States, 5 Cir., 1947, 161 F.2d 511, 514, certiorari denied 332 U.S. 769, 68 S.Ct. 81, 92 L.Ed. 354.

Registration of narcotics offenders (18 U.S.C.A. § 1407): Reyes v. United States, 9 Cir., 1958, 258 F.2d 774, 781–785.

Eight hour law (40 U.S.C.A. § 321): Ellis v. United States, 1907, 206 U.S. 246, 257, 27 S.Ct. 600, 51 L.Ed. 1047.

Miscellaneous decisions: Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692; Dennis v. United States, 1948, 84 U.S.App.D.C. 31, 171 F.2d 986, 990, affirmed 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734; Fields v. United States, 1947, 82 U.S.App.D.C. 354, 164 F.2d 97, 100, certiorari denied 332 U.S. 851, 68 S.Ct. 355, 92 L.Ed. 421.

13. United States v. Sussman, D.C.E.D.Pa. 1941, 37 F.Supp. 294, 296; Stone v. United States, 6 Cir., 1940, 113 F.2d 70, 75.

14. Hughes v. S. E. C., 1949, 85 U.S.App. D.C. 56, 174 F.2d 969; Norris & Hirshberg, Inc. v. S. E. C., 1949, 85 U.S.App. D.C. 268, 177 F.2d 228, 233.

15. Refusal of requested Charge No. 18, 21, and 8.